Gerald P. Culkin, J.
This is a proceeding brought pursuant to article 78 of the CPLR to review and annul a determination of the Superintendent of Insurance of the State of New York (Superintendent), approving an increase in subscriber premium rates of the Associated Hospital Service of New York (AHS), a nonprofit hospital service corporation organized and existing under the provision of article 9-C of the Insurance Law. Respondents, Superintendent and AHS have answered and here move for dismissal of the petition as insufficient in law and AJEIS further moves for summary judgment. Petitioner asserts that factual issues are raised and seeks a trial thereof, pursuant to CPLR 7804 (subd. [h]).
Initially, respondents challenge the petitioner’s standing to bring these proceedings, charging that he has not suffered an invasion of any legally protected individual right by the grant of the subscriber rate increase, so as to entitle him to seek judicial review thereof. Indeed, the Superintendent believes himself to be the “ sole guardian of the public interest,” in regard to approving or disapproving requests for rate increases by AHS, suggesting that his actions are virtually unreviewable. We deem the cases cited by respondent in support of this proposition to be inapposite to the case at bar. Petitioner does not allege that he is vindicating any right of the public at large, but rather his individual rights as a premium-paying subscriber of AHS. As such he is directly and individually affected by any increase in AHS subscriber rates. In view of legislative pronouncements in respect of judicial reviewability of acts of the Superintendent (see e.g., Insurance Law, §§ 34, 257, subd. 2), the court rejects the suggestion that his determination in this matter is nonreviewable.
Nor can it seriously be questioned that this court has the power to order a trial of factual issues found to exist upon such *280 a proceeding as here. While such a trial is not here deemed appropriate, the court is in agreement with petitioner’s assertion that one such triable “ issue ” might well be a determination of the objective adequacy of complex financial reporting data and procedures upon which an administrative determination is founded.
A great many affidavits, exhibits and briefs have been submitted to the court for consideration upon these motions. While former restrictive practice dictated that only the petition was to be considered upon a motion addressed to the legal sufficiency of that pleading, the increased liberality of the CPLR regarding such motions generally (CPLR 3211, subd. [a], par. 7), and the conjoining of a motion for summary judgment, have inclined the court to consider all the papers submitted herein. Having acceded to the parties’ own efforts to broaden the scope of this judicial inquiry, the court finds, in papers dehors the pleadings, sufficient to cure a rather glaring defect in the petition, namely, its failure to supply a source or basis for allegations made merely on information and belief. The court has also entertained affidavits and amicus curice briefs from representatives of a number of organizations interested in and affected by these proceedings. Joining the petitioner in attacking the Superintendent’s determination are the New York State AFL-CIO and the United Federation of Teachers, whose members constitute a substantial number of subscribers. Conversely, a number of hospital groups have submitted exhibits and affidavits in refutation of certain blanket charges levelled at the hospital community of the greater metropolitan area by the petitioner in the course of these proceedings, which charges have received considerable publicity in the local press. These charges variously include allegations of ‘ ‘ chiseling, cheating, waste or theft ’ ’ on the part of AHS member hospitals; a “ cozy and oft-times clandestine relationship ” between member hospitals and AHS and “ unjust enrichment, short of indictable conduct ”. Responding to these charges are the following groups: The Greater New York Hospital Assn., Inc., representing 99 voluntary, nonprofit hospitals and homes, 25 municipal hospitals and 10 community organizations; and the Association of Private Hospitals, Inc., representing 29 of the 39 proprietary hospitals in New York City. Lastly, a number of administrative officials of voluntary, nonprofit hospitals have submitted individual affidavits as part of respondents’ moving papers.
These charges of conscious wrongdoing, while serious and deserving of a fuller exposition, have but an indirect bearing on this proceeding, and will not be pursued herein. Were a *281 sufficient showing of such wrongdoing made to the Superintendent, as would have reasonably required him to undertake an investigation to determine the effect on subscriber rates, then his failure to so act might well put in doubt the reasonableness of any determination. An examination of the record of the hearings held, however, leads the court to conclude that no sufficient showing of wrongdoing was made to justify such action. Moreover, for reasons stated below, the court finds that in the unique situation here presented, not even clear proof of these charges would require overturning the particular determination here challenged. In this latter regard, the court is mindful that various District Attorneys and other investigative bodies have, at petitioner’s urging, undertaken an extensive investigation of these charges. Surely appropriate judicial proceedings will follow upon these investigations, if warranted. One area of this issue is worthy of mention. Petitioner’s own papers demonstrate that these charges are aimed at the community of proprietary (profit-making) hospitals and not at our voluntary, nonprofit institutions. Without making any prejudgment concerning the existence of or extent of wrongdoing on the part of private hospitals, the court finds it regrettable indeed that countless charitable institutions, selflessly serving our community, have been needlessly tarred with the same brush of blanket accusation.
The only questions which may be raised in a review proceeding under article 78 of the CPLR are enumerated in CPLR 7803. Of these, only two are conceivably applicable herein: (1) whether the Superintendent failed to perform a duty enjoined upon him by law, and/or (2) whether the Superintendent’s determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion.
The duties specifically imposed upon the Superintendent in respect of AHS, as here applicable, are set out in the following statutory provisions: section 28 (subd. 2, par. [a]) of the Insurance Law, which directs him to examine into the affairs of AHS at least once every three years; subdivision 2 of section 254 of the Insurance Law, which provides that all rates of payments to hospitals made by AHS be approved as to reasonableness by the Superintendent, prior to payment (the duty of determining the adequacy of these rates is charged to the Commissioner of Social Welfare); subdivision 2 of section 255 of the Insurance Law, which provides that AHS shall not enter into any contract with a subscriber unless and until it files a full rate schedule with the Superintendent and obtains his approval thereof. *282 There is the further provision that the Superintendent may refuse such approval if he finds that such rates are “ excessive, inadequate or unfairly discriminatory ’ ’; subdivision 4 of section 256 of the Insurance Law authorizes the Superintendent to approve a reduction of AHS’ Reserve Fund down to 75% of the amount set by statute (even lower reductions are authorized in the event of epidemic or other catastrophe). Such reduction, however, must be restored within a period of three years; subdivision 2 of section 255 of the Insurance Law also mandates that any rate approved by the Superintendent must make provision for such increases as are necessary to meet the above requirement for restoration of reserves.
Early this year, AHS made an emergency application for reduction of its statutory reserves and at the same time sought approval of a comprehensive new plan (the Current Cost Proposal) which would have significantly altered (and substantially increased) its subscriber premium rates. After due consideration of the financial picture of AHS, which showed, inter alia, an operating loss of over $13 million for the first three months of 1964, the Superintendent granted approval of a 25% emergency reduction in required reserves, “being satisfied that failure to do so would have left the Plan in a condition wherein it would be deemed to be insolvent on or about March 31, 1964 and consequently subject to liquidation ’ ’. This determination by the Superintendent is not here challenged by the petitioner.
As to the new Current Cost Proposal, the Superintendent directed that public hearings be held (though none are presently required by statute). Some 36 persons were heard during three days of hearings, including the petitioner. Others submitted their views in writing. Numerous exhibits were received and a voluminous record made, major portions of which have been submitted with the moving papers. The Superintendent asserts that in reaching his determination, he had available and relied upon not only the evidence adduced at the public hearings, but the following as well: (1) results of the last triennial audit of AHS, conducted in 1961, which included not merely an audit of the books and records of AHS but a review of hospital costs submitted by each member hospital to AHS; a review of audits of the books and records of member hospitals made by AHS staff auditors; reports to AHS on field audits of member hospitals made by independent certified public accountants; test checks of claim files, and an examination of AHS administrative expenses and underlying data to determine propriety of expenses, adequacy of supporting bills and appropriateness of expense classifications; (2) annual financial and statistical *283 reports submitted to the Department of Social Welfare by all hospitals receiving funds from public sources; (3) annual certified financial and statistical reports submitted by AHS member hospitals to various ‘ ‘ parent ’ ’ groups, .such as the United Hospital Fund of N. Y., the Federation of Jewish Philanthropies of N. Y. and Catholic Charities, Division of Health and Hospitals ; (4) annual financial and statistical statements filed with the Department of Insurance by Proprietary Hospitals, Medical & Dental Service and Indemnity Corporations. The Superintendent further asserts that, at his direction, Insurance Department examiners performed up-to-date test checks of all computations and reviewed annual cost reports submitted by 46 member hospitals (both voluntary and proprietary) for mathematical accuracy, conformity with the so-called hospital reimbursement formula and verification of supplemental payments.
At the conclusion of the public hearings and after consideration of all the above-listed matter, the Superintendent rejected AHS’ “ Current Cost Proposal ”. On this motion, it is unnecessary to consider the substance of this Current Cost Proposal or the detailed basis for its rejection. Suffice it to say that the Superintendent concluded that he was not presented with sufficient objective criteria to permit a determination of the reasonableness of the requested rate scheme.
However, the Superintendent then took an extraordinary .step and made an unsolicited offer to approve a rate increase based on current rating methods. He determined that, on the basis of the material considered by him both in respect of the emergency request for invasion of statutory reserves and the Current Cost Proposal, AHS was in such a precarious financial condition that some immediate rate relief was necessary to temporarily insure its existence. He accordingly advised AHS that he felt that rate increases averaging 32.92% were necessary to permit AHS simply to survive through 1965 and that he would approve a request for such increases if made. Needless to say, AHS immediately requested and received approval for this increase.
At this point it is evident that the first of the two questions raised by the review proceeding must be answered in favor of the respondent. Clearly, the Superintendent performed all duties enjoined upon him by law. A triennial examination of the books and records of AHS had been conducted. Prior approval of rates of payment to member hospitals had been obtained in 1960 when the so-called reimbursement formula was adopted and again in 1962 and 1963 when the formula was readjusted. The presently challenged rate increases in sub *284 scriber premiums were approved in advance of their effective date, after an examination which the Superintendent at least deemed sufficient. His approval was perforce founded on a conclusion that these rates were neither “ excessive, inadequate or unfairly discriminatory”. In granting the increase, the Superintendent took into consideration the requirement that some provision must be made for restoration of reserves, following his grant of permission to invade reserves.
Consequently, it only remains to be determined whether the Superintendent acted in an arbitrary and capricious manner and/or abused the discretion invested in him by legislative fiat. In making such a determination, of course, the test is whether or not there was a reasonable and plausible basis for the Superintendent’s action and not whether the petitioner or the court might have proceeded differently or reached a different conclusion.
The petitioner assails the determination of the Superintendent on three principal grounds: (1) the financial data relied upon by the Superintendent could not and did not accurately reflect the true financial picture of AHS; (2) in passing upon the “ reasonableness ” of subscriber rates, the Superintendent failed and refused to inquire into the reasonableness of rates of repayment to member hospitals, the latter inquiry being essential to a proper determination of the former; (3) the Superintendent failed to take account of certain deficiencies in the basic rating scheme of AHS and certain abuses in the current operation of the plan.
The court finds merit in much of petitioner’s argument, and were this the ordinary rate increase situation, might well conclude that the Superintendent’s action was unreasonable. The Superintendent is required by law to examine into the affairs of AHS “ at least once in every three years ” (Insurance Law, § 28, subd. 2, par. [a]). Choosing to do the very least required, he conducts but one audit every three years, regardless of the frequency of rate increase requests. As a consequence, he was forced to rely in large measure upon a 1961 audit to determine the reasonableness of 1964 rate requests. Certainly the very limited contemporaneous examination ordered by the Superintendent was no adequate substitute for a full-scale audit. It may well be that, in the ordinary case, nothing less than a current full-scale examination would suffice to support the reasonableness of a rate increase approval. Petitioner also challenges quite vigorously the degree of reliance that the Superintendent places on facts and figures supplied by AHS and its member hospitals. It is true that petitioner has not yet taken the *285 occasion to substantiate Ms charges of mass collusion and conspiracy among member hospitals, AHS officials and independent public accountants. Nevertheless, sound judgment would seem to dictate against almost exclusive reliance on facts and figures supplied by those seeking a rate increase, if for no other reason than the obvious realization that honest advocacy can do strange things to the accuracy of figures.
However, the court differs with petitioner’s first assertion in respect of the particular situation here involved, and finds that, on the basis of all the matter submitted herein, the Superintendent had before him sufficient data to form a reasonably accurate picture of the immediate financial condition of AHS. ‘1 AHS may be considered * * * under the terms of the statute, technically insolvent” (letter of Superintendent dated March 31, 1964). The court further concludes that the Superintendent’s action in granting temporary emergency relief both as to rates and reserves was not unreasonable under the circumstances. These findings are dispositive of this proceeding. However, the position taken by Superintendent on a number of objections made by petitioner leads the court to believe that the Superintendent so misconceives his duties and powers as to cast doubt on the possibility of reasonable future rate request determination. Consequently, further extended comment is deemed in order.
The Superintendent’s conception of his functions and duties is most clearly pointed up in respect of the question of rates of payment to member hospitals. Arguing from the language in Matter of Old Republic Life Ins. Co. v. Wikler (12 A D 2d 310, affd. 9 N Y 2d 524) approving, in principle, the use of a formula or schedule in passing on the statutory standard of reasonableness of rates, the Superintendent contends that he is under no obligation, legal or otherwise, to re-examine the hospital reimbursement formula set up in 1960 under subdivision 2 of section 254 of the Insurance Law, whenever AHS seeks a new increase in subscriber rates under subdivision 2 of section 255 of the Insurance Law. Further, he asserts that the Legislature implicitly approved the reimbursement formula on two occasions and presumably it is not his province to change or alter that scheme in any way. The court does not find support for his position in the cited case. It is true that when the Legislature was acting to extend existing provisions for the supervision of rates of payments to hospitals to cover nursing homes, and convalescent homes (1961 and 1963) it necessarily had before it the basic reimbursement formula and could have taken the occasion to condemn the same if it so *286 chose. Their .silence might well be taken as implicit confirmation of the basic scheme. However, this does not mean that the Superintendent is justified in assuming the role of a mere automaton, blindly approving mathematically correct adjustments (i.e., rate increases) in the formula. What may have seemed proper and feasible in theory in 1960 might well prove to be unworkable and impractical in 1964. It would be clearly unreasonable for the Superintendent to approve increases in rates of payment to hospitals solely on the basis of the mechanical application of a mathematical formula, if that application were in total disregard of changing circumstances affecting the basic scheme and in total disregard of possible perversion of the scheme by its participants. Nor is it any more reasonable for the Superintendent to attempt to pass upon requested subscriber rate increases without giving any consideration to the adequacy and reasonableness of hospital repayment rates. The relation between the two is elemental. There would be no need for subscriber rate increases were it not for two factors: firstly, there has been a significant increase in utilization of hospital services by AHS subscribers and secondly, and more importantly, there has been a tremendous increase in the reimbursable cost of hospital services.
In fact, despite his protestations concerning what he must and need not do, the Superintendent gave substantial consideration to hospital costs in reaching his instant determination and presumably would give equal weight thereto in future rate applications. However, in spite of the mass of statistical information the Superintendent is able to marshall, petitioner points to a basic flaw in the handling of this matter which makes any .such consideration unreasonable. The Superintendent does not and will not examine into the reasonableness and propriety of payments made to member hospitals by AHS. Taking refuge behind the strict letter of the law, he asserts that it is his duty to determine the reasonableness of “ rates ” of payments, not reasonableness of payments themselves. He argues that examining into actual payments would be an overwhelming task and that he would be unable to examine individual patient records because they are protected by “privilege”. Indeed, he argues that he does not even set rates of payment — AHS does this — he only approves them. This last, a distinction without a difference, is belied by the very action here challenged. What privilege, if any, surrounds the hospital bills of AHS contract holders is an open question. Certainly AHS itself has experienced no difficulty in securing the records the Superin *287 tendent deems inviolate. Moreover, there are many areas of inquiry other than individual patient records, which the Superintendent might pursue if he would truly be the self-proclaimed ‘ ‘ guardian of the Public interest ’ ’. A brief consideration of the so-called reimbursement formula might bring them more clearly into focus.
In November, 1960 AHS obtained approval from the then Superintendent of Insurance for a new formula for reimbursing hospitals for services performed for subscribers. (This formula was revised in 1962 and again in 1963.) The basic philosophy behind this formula was to allow a more equitable reimbursement of member hospitals for the totality of medical services provided. AHS subscribers were to bear, as uninsured patients must bear, a proportionate share of the total cost of providing medical facilities, rather than simply pay the raw cost of medical services specifically provided to them. This was accomplished by means of a complicated arrangement for setting a “per diem reimburseable rate ”. Basically, this rate was to be arrived at by dividing total operating expenses by total patient days. Certain items were specifically excluded from calculation of total operating expense, e.g., medical research, operation of concessions and cafeterias, expenses not covered by subscriber policies, such as blood plasma and radiation therapy. Other items could be included in operating expense, but only up to a stated percentage. These included the expense of providing service to private ambulatory patients, extraordinary repairs and plant maintenance, salaries of supervisors of interns and residents, and capital costs. The capital cost allowance for voluntary hospitals was limited to a percentage of total reimbursable expense calculated without any consideration of capital costs, and the moneys arrived at, must be maintained in special capital cost funds, with restrictions placed on their use. Proprietary hospitals have several means of calculating capital costs. Those owning their plant and equipment can establish a value for the total plant on the basis of a self-appraisal of its worth. They are then permitted a percentage of this amount, together with a percentage of depreciated value based on cost. Those leasing plant and equipment may include rents paid (providing these are “ reasonable ”) and a percentage of amortization of leasehold improvements and depreciation. All proprietary hospitals may include the salaries, fees and other payments to individual owners, directors and stockholders for “ essential ” services provided such payments are found to be “ reasonable ”, Presumably, *288 all operating expenses not specifically excluded or limited in amount, may be included in full in calculating total operating expense.
In recognition of the fact that different types of hospital accommodations have different capacities for producing income needed to defray over-all expenses, and in an effort to prevent inequity between hospitals having different proportions of their total services devoted to rendering different types of services, the formula was further refined by ‘ ‘ weighting ’ ’ patient days before dividing the same into total expenses. The weighting involved multiplying the total patient days in each category (newborn, ward, semi-private, private) by varying percentages.
Lastly, all member hospitals were divided into 15 groups (based on size, location and nature of services rendered). A ‘ ‘ group average ’5 reimbursable per diem rate was then determined. No group member was then to receive payments 15% greater or lesser than the group average, but in the usual case, a member would receive the minimum group rate even if its individual per diem rate were lower. The plan contains many, many other features but the foregoing is sufficient to indicate the involved, complex nature of the scheme. Overseeing and controlling this mathematical labyrinth is AHS, which sets, changes and interprets provisions of the plan through the medium of its review committee. So complete and unfettered is this control, that when AHS discovered that substantial over-payments had mistakenly been made to member hospitals, its review committee decided that no repayment was necessary but that these amounts would be set off against supplemental payments that might come due to the hospitals in succeeding years.
The Superintendent, meanwhile, would have us believe that he is to play absolutely no part in supervising or controlling this plan. He would have us believe that it is none of his concern whether payments are based on mistaken facts, fictitious charges, fictitious employees or even fictitious patients; nor that he should be concerned with making any independent evaluation of the reasonableness of capital cost appraisals, rental expenses, salaries and fees of owners of proprietary hospitals or any of the myriad other details which would require him to go beyond the four corners of balance sheet and ledger book. In 1960, respondent’s predecessor when approving the basic formula, recognized that 11 the reasonableness of any hospital reimbursement proposal must necessarily be assessed in the light of — though not controlled by — the structure of current hospital pricing procedures.” An evident corrollary of this is that the reasonableness of any subscriber rate proposal must *289 necessarily be assessed in the light of the operation and effect of the hospital reimbursement formula. We reject the restrictive interpretation the Superintendent puts upon his authority. Surely, we must conclude, by implication if not otherwise, that the Superintendent has been empowered to do all that is reasonably necessary to fulfill the duties imposed upon him. The Superintendent cannot be left to stand idly by while even the possibility exists that hospitals have unreasonably skyrocketed their valuations of plant and equipment, that all proprietary services have become 61 essential ’ ’ and therefore fully reimbursable, that rental expenses have become a convenient substitute for capital expenditures, that expensive yet unnecessary medical services are being reimbursed, that the cost of unnecessary expansion of medical facilities is being underwritten by AHS subscribers. The court opinions that the Superintendent is charged not merely with the responsibility of seeing that the AHS plan is run honestly, but efficiently as well. At the. very least, subscribers have a right to expect that AHS will not be permitted to actively encourage inefficiency of operation. Yet, this is the result, if not the intent of AHS operation of the plan. Both AHS and the Superintendent seem intent on adopting the notion that no matter how costly operations become, for whatever reasons, eventually and inevitably, AHS subscribers will shoulder the load. Small wonder that subscriber rates have increased 124% in the past five years.
The petitioner despairs of hoping that the Superintendent will correct abuses that may or can exist under the present scheme, and so seeks to expose the entire plan to the scrutiny at public trial. The court finds that the relief requested is unwarranted in the context of this judicial proceeding. Further, the Superintendent has properly exercised his discretion in this instance in forestalling inevitable disaster by granting AHS temporary financial relief. Recognizing that a crossroads has been reached, the Superintendent provided what he deemed sufficient time to re-evaluate the entire picture. The court concurs in the fact that he has directed AHS to commence providing monthly reports of its operations and has ordered a study of the controversial question of “ experience rating.” Seven and one-half million AHS subscribers in the metropolitan area of New York City alone are certainly entitled to protection to see that their premiums are wisely spent, and that AHS will never again be on the brink of insolvency.
This court feels that corrective legislation is warranted, and in this determination is constrained to dismiss the petition, and the same is hereby dismissed, without costs.