Joseph A. Brust, J.
Two separate article 78 proceedings are before this court for determination, one by petitioner Mario A. Procaccino individually and as Comptroller of the City of New York and the other by the petitioner City of New York. Both petitioners are applying for judgment annulling the determination of respondent Bichard E. Stewart, as Superintendent of Insurance of the State of New York, dated August 15, 1969, which approved an amended application of respondent Associated Hospital Service of New York (commonly known as “ AHS ” and “ Blue Cross ”), for an increase averaging 43.3% in premium rates on its community-rated contracts, effective October 1, 1969 on contracts now in force and effective immediately on new contracts.
Bespondents have interposed answers denying material allegations of both petitioners, pleading affirmatively that neither petitioner is an “ aggrieved person ”, that they have no standing to maintain these proceedings and, furthermore, that they do not allege sufficient facts entitling them to any relief. Blue Cross has also formally moved to dismiss the . petition summarily.
At the hearing held before this court on August 27, 1969, all parties hereto stipulated in open court that both these article 78 proceedings be consolidated and treated as one for the purpose of hearing and determination. It was further stipulated that Marie Bose Procaccino, a daughter of petitioner Procaccino, who is a ‘ ‘ community-rated ’ ’ subscriber of Blue Cross, be added as a party petitioner to the Procaccino proceed *553 ing and that the caption of said proceeding he deemed amended accordingly.
On May 22, 1969, Blue Cross applied to the Superintendent of Insurance for a premium rate increase on its ‘ ‘ community-rated ” contracts averaging 49.5%. On August 14, 1969 the Superintendent rendered an opinion and decision denying the requested 49.5% rate increase, but indicating that he would grant an application for a rate increase averaging 43.3%. Accordingly, on August 15,1969, Blue Cross submitted an application for the suggested 43.3% average rate increase and it was granted the same day by the Superintendent of Insurance. In his afore-mentioned opinion and decision, the Superintendent of Insurance stated that according to his projection of the amounts of future drain on the assets of Blue Cross, if the present rate levels were to continue, Blue Cross would become legally insolvent some time in October, 1969, and that an increase averaging 43.3% was the minimum necessary rate increase which would permit Blue Cross to function at approximately the present level of benefits. He failed to state clearly the duration of time for which a rate increase was approved, refusing to grant it on the usual two-year basis, but indicating that it would be good “until the end of 1970”. Subdivision 3 of section 256 of the Insurance Law requires public corporations providing insurance to its subscribers against the cost of hospitalization, such as Blue Cross, to maintain a surplus equal to at least 5% of its annual premium volume. This 5% may be waived, with the permission of the Superintendent of Insurance, and decreased to 2%%, but in such event the 5% surplus must be restored within two years (Insurance Law, § 256, subd. 4). On June 24, 1969 while Blue Cross’ application for a rate increase was pending before him, the Superintendent of Insurance authorized a temporary reduction on the surplus from 5% to 2%%.
The record discloses that there are approximately eight million Blue Cross subscribers, of whom some 53% are on the “ community-rated ” basis and approximately 47% are on the “experience-rated” basis. All employees of the City of New York, including petitioner Procaccino, as Comptroller, are covered by ‘1 experience-rated ’ ’ contracts and the premium rates for this category are fixed on the experience of the group in which the particular subscriber is a member. The City of New York pays the premium for all its employees.
Initially, as to the jurisdictional attack on petitioners’ capacity, it plainly appears as to both that the contention is without merit. The subject matter of these proceedings is permeated *554 with public interest and concern, and, unquestionably, if any relief is granted to these petitioners, it will redound to the benefit of the general public (see 22 Carmody-Wait, New York Practice, § 310, pp. 397, 398; Matter of General Bldg. Contrs. of N. Y. State v. County of Oneida, 54 Misc 2d 260). The health and welfare, if not the very lives, of many of the 8 million citizens, who are AHS subscribers, are inextricably connected with the rates charged them for Blue Cross service, and petitioners, on this basis alone, may be sustained in their standing to represent such citizenry.
Moreover, any citizen is legally capable of maintaining a proceeding to compel the enforcement of an official duty mandated by statute, as will appear hereafter, especially if the matter is of abiding interest to the community at large (see Matter of Andresen v. Rice, 277 N. Y. 271, 281; Matter of Kornbluth v. Rice, 250 App. Div. 654, affd. 275 N. Y. 597).
In addition, however, both petitioners have sufficiently demonstrated that they have special interests in respondent Superintendent’s decision to permit AHS rate augmentations; that they are parties aggrieved; and that they each have standing to complain as such. The City of New York has a contract with AHS in behalf of thousands of city employees. Comptroller Procaccino, individually, is a premium-paying subscriber (see Matter of Thaler v. Stern, 44 Misc 2d 278).
It is of no significance that petitioners are experience-rated subscribers, whereas the present rate increase is directed only to community-rated subscribers and to new subscribers. There is an interwoven and built-in relationship — acknowledged by respondent Superintendent himself — between the charges for community-rated contracts and the charges for experience-rated contracts. A rise in one contract rate historically and inevitably results in a corresponding increase for the other. Economically and practically, in fact, there can ultimately be no other result, since the primary factor in determining all Blue Cross subscriber premiums is the rates at which Blue Cross reimburses its member hospitals, whether for community or experience-rated subscribers. There can be no doubt, therefore, that petitioners will suffer personal injury as a result of the complained of acts and that, again, they have legal standing to sue herein accordingly (see Matter of Donohue v. Cornelius, 17 N Y 2d 390, 397).
Furthermore, as to petitioner city, an even more direct personal aggrievement will be suffered if the Superintendent’s action is allowed to stand, stemming from said petitioner’s obligation to operate and to maintain a number of municipal *555 hospitals. It is crystal clear that the extensive premium increase directed by the Superintendent will compel a great many families, immediately and prospectively, through financial inability, to discontinue their AHS coverage. As such, when, thereafter, hospitalization is required, they will be forced to seek the largest of the municipal hospitals (already overcrowded and understaffed), and petitioner city will be compelled to assume these increased financial burdens. Once again, direct economic injury suffices to establish standing as a party aggrieved.
Finally, and in all events, we have a newly-joined party petitioner, Marie Bose Procaccino, who, in her own right, is a fully paid community-rated subscriber, and who already has been afforded written notice by AHS of a prospective premium increase as of October 1, 1969. Accordingly, even if the standing of all other petitioners was now rejected, the proceedings would clearly be maintainable by this petitioner alone.
As to the legal sufficiency and merits of the petitions, it appears that petitioners are correct in their assertions that respondent Superintendent of Insurance has acted illegally, in prematurely rendering a decision to permit increases in AHS subscriber rates, and arbitrarily and capriciously, in fixing the percentages of increases allowed.
The public hearing conducted by respondent Superintendent, before he approved his own suggested, “ temporary ” rate increase formula, was apparently merely an abortive exercise in ‘ ‘ fish bowl group therapy ’ ’, providing a forum for verbal expression of public indignation and private support, but affording little realistic opportunity for an adversary-type proceeding in which detailed contradictory evidence would be presented and in which the cross-questioning of witnesses concerning their supposedly expert views might be undertaken. (This suggested adversary type of hearing, incidentally recommended by the Superintendent in his own decision, but not adopted by him in practice, the practical benefits of which are obvious, is a course earnestly suggested for legislative consideration and approval). Despite this voluminous, so-called public hearing, respondent Superintendent, in making his determination, admittedly did not receive prior certification of new hospital payment rates from the State Commissioner of Health; did not first approve any such new payment rates as legally mandated; and did not take into consideration any such new hospital rates or the revised method for fixing such charges, as recently prescribed by the Legislature (see Public Health Law, § 2807, subds. 2, 3 [L. 1969, ch. 957]). In fact, the Superintendent *556 specifically rejected the necessity for prior certification by the State Commissioner of Health, stating that such certifications were not1‘ legally prerequisites to Insurance Department action on Blue Cross subscriber rates.”
Subdivision 2 of section 254 of the Insurance Law provides that all rates of payments to hospitals, made by corporations such as AHS pursuant to contract, must be certified initially by the State Commissioner of Health (pursuant to article 28 of the Public Health Law), as the investigating arm of the Superintendent of Insurance, prior to payment and must be approved thereafter as to reasonableness by the said Superintendent of Insurance. Subdivision 2 of section 255, of the Insurance Law provides that no corporation such as AHS can enter into any contract with a subscriber unless a full schedule of rates has been filed with and approved by the Superintendent of Insurance, who may refuse approval if he finds that such rates are excessive, in adequate or unfairly discriminatory. The newly enacted provisions of the Public Health Law aforesaid provide for an entirely different mode for calculating hospital costs, which is “ reasonably related to the costs of efficient production of hospital service ” and which eliminates various formerly approved hospital charges, as opposed to the former, in effect, cost plus basis formula.
The legislative intent clearly was that all of the aforesaid provisions of law be read together to form a reasonable and practical means for the Superintendent to fix AHS subscriber rates. No reasonable, sensible or logical decision can be reached as to what AHS should legally, economically and practically be permitted to charge its subscribers until it is definitely known what its basic outpayments to member hospitals will be. No business so imbued with public interest should be allowed to secure increased subscriber rates before, realistically, its full costs are known. No public official with the mandated duty to approve such charges to subscribers should be allowed to increase such rates before a firm and reasonable evidentiary foundation has been provided for the necessitating of such increases. Guesswork in this regard, and projections based upon antiquated cost systems, cannot serve as a reasonable basis for such a vital determination. Nor ¡may an unbuttressed statement of a Deputy State Health Commissioner — that the impact on AHS payments of implementation of the new cost control legislation “ will not be of a magnitude to effect a reduction in payments below those projected through 1970 ” (unsound on its face) —serve as a substitute for a legally mandated initial certification of costs by the Commissioner of Health and *557 approval thereof thereafter by the Superintendent of Insurance before the authorization of any subscriber rate increase (see Matter of Thaler v. Stern, 44 Misc 2d 278).
Plainly, under the newly promulgated legislation (L. 1969, ch. 957), the Superintendent of Insurance must obtain a certification from the Commissioner of Health ‘ ‘ prior to the approval” of hospital rates, and, accordingly, such certification is a prerequisite to an increase in subscriber rates for AHS, and this court now so holds.
For all of the foregoing reasons, it is clear that respondent Superintends acted prematurely and illegally in fixing any increase in rates for AHS before obtaining and approving a certification of reimbursable hospital costs. In this regard it is noted that the Commissioner of Health has just recently concluded public hearings on such costs and is yet to make any certification of same, but that he is required to do so before December 31,1969.
Moreover, respondent Superintendent, in all events, acted in an arbitrary, capricious, hasty and ill-advised fashion in fixing the average increase at 43.3%. The Superintendent made no independent appraisal and approval, in accordance with subdivision 3 of section 2807 of the Public Health Law, of the rates at which AHS reimburses its member hospitals, which must, perforce, be the basis for setting subscriber rates. Based upon this present law, the Superintendent has shown no reasonable, practical or logical grounds for his percentage increase, which he claims to be “ temporary.” (It is noted that the last “temporary” increase in rates permitted AHS in 1964, has continued for some five years and that it initially produced an excess fund of over 19%, as compared with the permissible 5% excess, during which period no offer or even suggestion of reimbursement to subscribers was made by Blue Cross.) In fact, the contrary appears. Even the President of AHS, J. Douglas Colman, conceded in his testimony before the Superintendent that only an average 31% increase was needed to keep his organization from statutory insolvency in the immediate future. Accordingly, the gratuitous setting of substantially higher average increased rates by the Superintendent, without proper or reasonable support, must be held to be arbitrary and beyond permissible bounds.
The argument that respondent Superintendent was forced to take emergency measures because of the imminent statutory insolvency of AHS is a plaintive begging of the questions in issue. No good reason appears to buttress the Superintendent’s acknowledged policy of allowing AHS to balance precariously *558 on the brink of insolvency before considering a subscriber rate increase. Even less reason appears to permit the Superintendent now to act in an illegal and arbitrary fashion because of his own past derelictions.
The court is not unmindful of the present financial status of respondent AHS and will make, hereafter, appropriate orders and directions to remedy temporarily such situation and to secure the continued efficient operation of AHS. Eight million people in this State have too much at stake to do otherwise. But, simultaneously, this court cannot permit illegality or impropriety in the name of emergency. The increase afforded was far in excess of any amount needéd to see AHS through this emergency period and it was approved for a duration much longer than necessary to cope with any such emergency.
For the .reasons stated, the petitions are granted to the extent now indicated; the Superintendent’s approval of subject increases is vacated and annulled; and the matter is remanded to the Superintendent of Insurance with the following instructions. Respondent Superintendent is directed (1) forthwith to determine and to approve a temporary “ emergency ” increase in the absolute minimum amount necessary to keep AHS Statutorily solvent pending certification of reimbursement rates by the Commissioner of Health, which emergency increase will be effective only up to and including a period of 30 days following completion and certification of a new reimbursement formula by the said Health Commissioner; (2) to require AHS to hold in escrow any amounts which may have been collected from new or present subscribers in excess of such minimum temporary emergency increase; (3) to not approve any rate increases for new subscribers to be effective before similar increases are effective for existing subscribers; and (4) promptly, after receiving certification from the Commissioner of Health and approving same, to consider de novo the AHS application for rate increases and to fix reasonable, nontemporary rates in conformity with the approved certification and in light of the new hospital cost-control legislation formula.
Respondent AHS, for its part, is directed to comply fully and to co-operate with the Superintendent of Insurance to implement the aforesaid directions and to abide, in the interim, with the terms of the temporary stay, now made permanent, until the Superintendent determines and approves the emergency rate increases.
The cross motions to dismiss the proceedings are, in all respects, denied.