In the Matter of MARIO A. PROCACCINO, Individually and as Comptroller of the City of New York, Respondent, v. RICHARD E. STEWART, as Superintendent of Insurance of the State of New York, et al., Appellants.

In the Matter of the CITY OF NEW YORK, Respondent, v. RICHARD E. STEWART, as Superintendent of Insurance of the State of New York, et al., Appellants.

First Department, September 25, 1969.

*Robert A. Bicks* of counsel (*Laurence R. Martin, John F. Carney* and *Charles M. Mitchell* with him on the brief; *Breed, Abbott & Morgan,* attorneys), for Associated Hospital Service of New York and another, appellants.

*Philip Weinberg* of counsel (*Samuel A. Hirshowitz* with him on the brief; *Louis J. Lefkowitz, Attorney-General*), for Superintendent of Insurance, appellant.

*Jacob D. Fuchsberg* of counsel (*Irving Lemov* with him on the brief; *Fuchsberg & Fuchsberg,* attorneys), for Mario A. Procaccino, respondent.

*J. Lee Rankin, Corporation Counsel* (*John R. Thompson, William M. Murphy* and *Gary Mailman* with him on the brief), for City of New York, respondent.

*Per Curiam.* Respondents-appellants Superintendent of Insurance and Associated Hospital Service of New York (AHS) appeal from the judgment entered at Special Term on September 9, 1969, in an article 78 proceeding, annulling the Superintendent's decision of approval of an increase in the rates to be charged by AHS to its community-rated Blue Cross subscribers, and remanding the matter to him to approve " a temporary emergency increase in subscriber rates * * * limited to the absolute minimum amount necessary to maintain the statutory solvency of respondent " AHS. In May, 1969, AHS applied to the Superintendent for rate changes and increases averaging 49.9% covering the contracts of such subscribers (Insurance Law, § 255, subd. 2); the Superintendent decided on August 14 that, while he disapproved the request as to amount, an increase averaging 43.3% would be in order, which increase was, on the following day, requested and approved, effective immediately as to new subscribers and on October 1, 1969, as to renewals.

Petitioners-respondents are the City of New York and its Comptroller, acting both as an individual and in his official capacity. While much appears in the papers filed at Special Term and in the briefs submitted here concerning their alleged lack of standing to sue because the relationships of both petitioners to AHS derived, not through community-rated contracts, but through experience-rated contracts, such objection has been effectively rendered moot by the stipulated addition of a community-rated subscriber as a party petitioner. Certainly, the objection to petitioners' standing to sue was not mentioned in argument, and, in any event, what happens in respect of one

classification of subscribers must eventually affect the other group and the rates it will be required to pay.

The court is neither a social agency nor a legislative body. Its duty is not to second-guess the wisdom of what an administrative agency has done, nor to reform the procedures and methods used by that agency. We are not, five years later, reviewing *Matter of Thaler* v. *Stern* (44 Misc 2d 278) cited for the thesis that emergency rates eventually become permanent, nor are we righting the wrongs of the past, whatever they may have been. We are considering only what is presented in this case, and our duty in the premises is so simple and clear cut as to be almost axiomatic: we are to determine if an administrative agency, here the Superintendent of Insurance, has acted in violation of law, without a rational basis, on insufficient considerations, arbitrarily, and capriciously.

" It is well-settled that the determination of an administrative agency will be accepted by the courts if it has warrant in the record and a reasonable basis in law." (*Matter of Willcox* v. *Stern,* 18 N Y 2d 195, 203.) Special Term has held that the Superintendent's decision departed from that standard of acceptability. We here hold that the Superintendent's decision did not depart from that standard, and it should not have been disturbed. It was not made in violation of law, it had a rational basis, and it was neither arbitrary nor capricious.

In arriving at his decision, the Superintendent took steps, as was his duty, to become informed so that he might wisely exercise the discretion entrusted to him. Though there is no requirement of law that he do so, the Superintendent, on receipt of AHS's application, held a public hearing on the subject, at which upwards of 30 persons, representing various facets of interest in the problem, expressed their views either orally or in writing. In addition, he took into account the proceedings of an Assembly committee which had explored the area. Further, and of prime importance, he caused a special audit to be made of AHS's books and records, and found AHS's financial condition and operations to be substantially as represented, without hidden assets.

The Superintendent's findings were that AHS's reserves had fallen, having been permitted to be invaded below statutory requirements (Insurance Law, § 256, subd. 3) by the Superintendent (subd. 4); that costs of operation amounted to 131% of premiums, and that, if circumstances continued as seemed likely, AHS would become statutorily insolvent (subd. 2) very shortly unless an increase in rates were permitted to be effected without delay. Drastic alternatives to an increase in rates,

including dissolution, were considered and, for reasons obvious and apparently not here disputed, discarded. (It is to be noted at this point that no party questions the necessity of an immediate increase in rates to keep AHS and its Blue Cross hospital services alive; the principal difference between the parties is, as will be seen, the duration and size of the increase.)

In determining the amount of such an increase, the period during which it is to obtain is of utmost importance. Obviously, assuming the continuance of current trends of inflation, the longer the future period under consideration, the greater must be the over-all increase. AHS exacts a premium from its subscribers, in return for which it furnishes services to them, as distinguished from a fixed cash amount. AHS pays hospitals for furnishing these services to subscribers at a price fixed by a process hereinafter described, but which essentially must take into account the cost to the hospitals of supplying the services. The process of fixing a premium rate must necessarily, therefore, particularly in a time of rising costs, involve the ascertainment of that period of future time for which a fairly accurate prognosis may be made of what the hospitals must pay in costs of operation and what AHS must pay the hospitals by way of reimbursement. Past performance is of no great value, for costs, reimbursements, and premiums must all be paid in the future.

The payments to hospitals by AHS are at rates to '' be certified by the commissioner of health pursuant to the provisions of article twenty-eight of the public health law and approved as to reasonableness by the superintendent [of insurance].'' (Insurance Law, § 254, subd. 2). As conceded at the argument, there was not at the time of the Superintendent's decision, there is not now, and there will not be until January, 1970, any applicable schedule of rates so certified by the Health Commissioner. This situation has come about because of amendment by the 1969 Legislature of the applicable law (Public Health Law, § 2807). Heretofore it had been provided by that statute that payments to hospitals for services by corporations such as AHS were to be made at rates '' approved as to reasonableness by the superintendent [of insurance] '' (subd. 2), prior to which approval, the Health Commissioner was to determine and to certify to the Superintendent '' that the proposed rate schedules for payments for hospital * * * service are reasonably related to the costs of providing such service '' and to specify '' the elements of cost taken into consideration.'' (subd. 3). The 1969 amendment (L. 1969, ch. 957, § 4) struck from subdivision 2 of section 2807 the words '' as to reasonableness '' which had qualified the Superintendent's

duty of approval of the reimbursement rates; these words were not, however, stricken from subdivision 2 of section 254 of the Insurance Law, so that reasonableness is still the measure of the Superintendent's duty and discretion in approval of rates of payment to hospitals. The amendment went on to add to subdivision 3 a provision that the Health Commissioner shall certify to the Superintendent that the rates '' are reasonably related to the costs of efficient production of such service ''; it then set up a list of guidelines of what elements of cost may or may not be taken into consideration '' in making such certification.'' As has been said, the first such schedule using the newly specified criteria will not be available until the end of this year, and would still require the study and approval '' as to reasonableness '' by the Superintendent before becoming effective. Even then, as a practical matter, they would not be effective until there was an expression of willingness by hospitals to enter into contracts at these rates.

In his decision, the Superintendent took the position that section 2807 of the Public Health Law relates only to section 254 of the Insurance Law, having to do with the setting of reimbursement payments to hospitals, and not, except in a roundabout way, to section 255, which has to do with the setting of premiums payable by subscribers. The Superintendent said, in effect that premiums cannot ordinarily be based on past performance only but must take into account a reasonable projection into the future, for subscribers must be able to plan ahead and budget with some degree of foreseeability and certainty. Other subscribers such as, for instance, those who must weigh Blue Cross rates as a factor in collective bargaining, must be able to calculate for a reasonable distance into the future. In short, it is said that, were the Superintendent to have waited for the new section 2807 schedule until January next and then to have used it even at once, without processing for reasonableness, as a factor in rate-making, AHS would have suffered intervening insolvency. In the alternative, should an emergency stopgap raise have been promulgated, the entire rate situation would have been thrown into chaos. Added to these considerations is another: too frequent rate changes are not economical; the mere mailing of an advice to the millions of subscribers represents an astronomical postage charge!

Since there was not available a method of developing a prognosis for the new section 2807 criteria bearing on the factor of hospital reimbursement cost, the Superintendent accepted the opinion of the Deputy Commissioner of Health to the effect that the best to be expected in the first year under the new section

2807 standards is a halt of escalation of costs, with consequent leveling off of reimbursement costs and rates instead of a rise.

Having in mind all this information, the Superintendent concluded that a period shorter than the usual two years would have to suffice for the new rate because of uncertainty as to important factors, and also because a shorter period than two years would require a smaller immediate increase; however, a period shorter than to the end of 1970 would create other difficulties and be extravagant in cost. Thus, a period running to the end of 1970 was selected.

Special Term characterized the Superintendent's hearing as " an abortive exercise * * * affording little realistic opportunity for an adversary-type proceeding " (60 Misc 2d 551, 555). This is gratuitous criticism of a classic method of gathering information, and completely overlooks the audit, as well as common knowledge of galloping inflation. Special Term also characterized the opinion of the Deputy Health Commissioner as " unbuttressed ", ignoring the fact that this expression came from the deputy to the very public official charged by section 2807 of the Public Health Law, with the duty of certifying proposed rates of reimbursement to hospitals; further, it is not said what other source of information might have been available on this score. And Special Term read the three pertinent sections together, interpreting them to mean that the Superintendent's duty to be performed pursuant to section 255 must await his having performed pursuant to section 254. The Legislature, in amending section 2807, did not do what Special Term has suggested for the obvious reason that it is unrealistic. Sections 254 and 255, relating as they do to entirely disparate functions of the Superintendent of Insurance, are to be read entirely separate and apart. The mere fact that the end product of one such function, with other factors added, is to be considered in performing the other function does not dictate that the second such function is to mark time while the first is completed. No statute mandates this paralysis, and there has been no logical process unveiled to compel the thought that the Legislature so intended. And certainly there is nothing pointing to a conclusion that the Legislature intended, or that the proper exercise of the Superintendent's discretion demands, that, pending the coming in of the Health Commissioner's section 2807 schedule of recommendations, and taking for granted approval thereof as reasonable by the Superintendent as automatic, the Superintendent's sole power and duty in the interim is to promulgate only an emergency interim increase. However, even should we, as did Special

Term, read the three sections together, to constitute integral parts of one legislative scheme, we find that, in the absence of the new statutory criteria and during the nascency of the new schedule to be proposed by the Health Commissioner, the Superintendent had little choice but to decide the issue before him as the exigencies of the situation demanded. Finally, Special Term apparently regarded the projected rate increase as arbitrary and capricious; it develops that the short-term emergency increase mandated by the judgment would be approximately three quarters of that directed by the Superintendent, to be effective over a period of a year longer, and arrived at with the benefit of an expert opinion as to the weight to be given to the new criteria set out in section 2807 of the Public Health Law. This is scarcely an abuse of discretion. Special Term regarded the effective period of the rate increase as fixed by the Superintendent to be too long and preferred a shorter emergency period, i.e. until the coming in of the Health Commissioner's section 2807 schedule and 30 days thereafter; considering only the added cost to AHS of making too frequent increases which is only one factor of the many involved the Superintendent's choice of period seems a valid exercise of administrative discretion. Even considered on the merits it does not appear that the expedient adopted by the Superintendent is any less wise than that arrived at by Special Term, and Special Term may not substitute its judgment for that exercised if properly done, by the administrative agency.

It appears that, in the circumstances, the Superintendent did all that he could do by way of assembling information and then acting rationally upon it in accordance with law, and his decision should " be accepted by the courts." As a matter of law, it may not be disturbed. Accordingly, the judgment entered September 9, 1969, should be reversed on the law, the decision of respondent Superintendent reinstated, and the petitions dismissed without costs.

NUNEZ, J. (dissenting). I dissent and vote to affirm the judgment appealed from.

In my view Special Term properly annulled the determination of the Superintendent of Insurance and remanded the matter to him for his reconsideration and approval of a temporary emergency increase in subscriber rates, limited to the absolute minimum amount necessary to maintain the statutory solvency of Associated Hospital Service of New York (AHS-Blue Cross); such increase to remain in effect pending certification of reimbursement rate schedules by the Commissioner of Health

pursuant to article 28 of the Public Health Law and for a period of 30 days following such certification. In this manner the solvency of AHS is preserved and the clear legislative mandate in the recent hospital cost control legislation (L. 1969, ch. 957) is observed.

In my view the Superintendent is duty bound to examine and approve the rates of payment by AHS to hospitals pursuant to section 254 of the Insurance Law prior to his approving an increase in rates pursuant to section 255. It would be clearly unreasonable for the Superintendent to attempt to pass upon requested rate increases without giving any consideration not only to the amount but to the reasonableness of hospital repayment rates (see *Matter of Thaler* v. *Stern*, 44 Misc 2d 278).

By the 1969 amendments, the Legislature has established certain standards by which the Commissioner of Health is to determine and certify approval of rates of reimbursement by AHS to member hospitals. Notable among those standards is one which restricts increases in the rate of reimbursement to the rate of increase in the cost of living. It appears from the AHS brief that a new schedule of rates of reimbursement to member hospitals will be certified by the Commissioner of Health during early January, 1970. Instead of approving increases for community rated plans that would insure the solvency of AHS for the short period pending the certification of the new rates of reimbursement, the Superintendent granted a purportedly emergency increase of much larger proportions to carry AHS through an indefinite period and at least through 1970.

While there is nothing on the face of section 255 of the Insurance Law making certification a condition precedent to rate approval, there are inescapable indications that such was within the intendment of the Legislature (see *Red Hook Cold Stor. Co.* v. *Department of Labor*, 295 N. Y. 1, 7). An examination of the history, terms and purposes of the legislation involved clearly shows the necessity for such certification which is designed as an incentive to hospitals to increase efficiency, improve services and institute economies.

AHS should not be permitted to approve requested rate increases by its member hospitals without giving any consideration to the adequacy and reasonableness of the hospital repayment rates. This would leave the subscribers completely unprotected at the mercy of the hospitals and bearing the cost of possible inefficiency of operation or unreasonableness of charges or inclusion of improper items in the amounts demanded by the member hospitals. An operation which is greatly affected

with the public interest, as this one is, should be carefully supervised and controlled.

By reversing Special Term and confirming the determination of the Superintendent, this court is perpetuating the Superintendent's procedure of approving only rate increases characterized as " emergency " measures in order to avoid statutory insolvency of Blue Cross. If this view of his functions, namely, that he need not take into consideration the rates of reimbursement, is ratified, there would be no incentive to AHS to apply for a restructuring of rates, the old rate structure would be perpetuated and costs thereunder would continue to spiral. By requiring the Superintendent to adhere to the new reimbursement formula mandated by the Legislature, subscribers are protected against the inefficiencies of hospital service and they will be assured that they need not shoulder them merely because Blue Cross is willing to go to the brink of insolvency before requesting an increase in premiums.

The Superintendent of Insurance in my opinion does not serve the public interest in granting the applied for increase in exercise of his emergency powers for a period far beyond January 1, 1970, at which time he will be in possession of the findings and recommendations of the Commissioner of Health. In granting this emergency " temporary " rate increase, the Superintendent has not only thwarted the legislative intent to terminate or at least slow down the skyrocketing costs of hospital care, he has failed to properly protect the interests of the millions of Blue Cross subscribers. In so doing he has gone illegally beyond his powers and his determination should therefore be annulled.

For the foregoing reasons and those stated by Mr. Justice BRUST at Special Term, I would affirm.

STEVENS, P. J., TILZER, MARKEWICH and MCNALLY, JJ., concur in *Per Curiam* opinion; NUNEZ, J., dissents in opinion.

Judgment reversed, on the law, without costs and without disbursements, the determination of respondent Superintendent of Insurance reinstated, and the petitions dismissed without costs.