No. 51,283

BLUE CROSS OF KANSAS, INC. and BLUE SHIELD OF KANSAS, INC., *Appellants,* v. FLETCHER BELL, AS COMMISSIONER OF INSURANCE OF KANSAS, *Appellee.*

(607 P.2d 498)

Opinion filed March 1, 1980.

*Gerald L. Goodell,* of Goodell, Stratton, Edmonds, Palmer & Wright, of Topeka, argued the cause, and *Charles R. Hay,* of the same firm, was with him on the brief for the appellants.

*Michael S. Mullen,* special assistant attorney general, argued the cause, and *Derek J. Shafer,* special assistant attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: Blue Cross and Blue Shield of Kansas (BCBSK) commenced an action in the Shawnee County District Court against Fletcher Bell, Commissioner of Insurance. of Kansas (Commissioner), as provided for in K.S.A. 40-1806 and 40-1906 to seek review of an order of the Commissioner denying all requests for an increase in rates for the year 1979 requested by BCBSK. In addition BCBSK sought a declaratory judgment under K.S.A. 60-1701 *et seq.*

The parties on appeal to this court indicate this action is the first of its kind under K.S.A. 40-1806 and 40-1906. It may be helpful to give some details and background. K.S.A. 40-1801 *et seq.,* provides for the organization of mutual nonprofit hospital service corporations such as Blue Cross of Kansas. K.S.A. 40-1901

*et seq.,* provides for the organization of mutual nonprofit medical service corporations such as Blue Shield of Kansas. Although these are separate corporations organized under separate statutes, the corresponding sections of the statutes contain almost identical provisions governing the organization and control of each corporation.

Kansas Blue Cross began operations in 1941 and sold its first contract in 1942. Kansas Blue Shield began operations in 1945 and sold its first contract in 1946. Both Blue Cross and Blue Shield belong to a national Blue Cross-Blue Shield organization that establishes standards that all plans must meet to be authorized to use the Blue Cross and Blue Shield names and logo. There are 75 Blue Cross plans and 70 Blue Shield plans across the country.

The business and affairs of Blue Cross of Kansas are conducted and managed by a 37-member board of directors that serves without salary or compensation. Nine members are administrators or trustees of Kansas hospitals, nine are physicians and 19 are members of the public. The business and affairs of Blue Shield of Kansas are managed and conducted by a 50-member board of directors that also serves without salary or compensation. Twenty-four members are physicians, one is a dentist and 25 are members of the public. Although Blue Cross and Blue Shield are separate corporations, the plans are administered by a single staff of approximately 1200 employees.

At the present time Blue Cross and Blue Shield serve approximately 51% of the Kansas population, a percentage figure well above that of most plans across the country. Both Blue Cross and Blue Shield provide service benefits rather than indemnity benefits. In other words, Blue Cross and Blue Shield enter into contracts with health care providers pursuant to specific statutory authority (K.S.A. 1979 Supp. 40-1803 and 40-1903). The contracts require that the providers accept payment from Blue Cross or Blue Shield as full payment for services rendered to subscribers. The providers are prohibited from charging additional fees to subscribers for covered services. Nothing in either enabling act requires hospitals or physicians, generally referred to as providers, to contract with Blue Cross or Blue Shield. Therefore, the contracts must contain terms that are mutually acceptable to both sides. The percentage of participation by Kansas providers is

among the highest in the country. Ninety-four percent of Kansas physicians are Blue Shield participants. One hundred percent of Kansas hospitals are Blue Cross participants. The high level of provider participation provides protection to subscribers by giving them assurance as to the predictability of health care expenses; subscribers know that they will not receive bills for covered fees over and above the amount Blue Cross-Blue Shield has paid.

When these two nonprofit corporations were first organized the law governing rates to be charged, L. 1941, ch. 259, § 6 and L. 1945, ch. 216, § 6, placed no control over rates with the Commissioner. In 1970 the legislature changed this and required that rates be filed with and approved by the Commissioner. L. 1970, ch. 182, §§ 1, 2. Nothing was said in this law as to the procedure or guidelines to be followed. As to Blue Cross the statute merely provided: "The rates charged by any such corporation shall be filed with and approved by the insurance department." As to Blue Shield, the law provided: "Subscription charges fixed by any such corporation shall be filed with and approved by the insurance department." Under these prior laws rates were set by the boards of directors of the corporations. Approval by the Commissioner came as a matter of course.

Then L. 1972, ch. 185, §§ 1, 2 were passed by the Kansas Legislature and became effective. K.S.A. 40-1806 and 40-1906. In summary these statutes require the corporations to file their rates with the Commissioner. These statutes further provide that any filing shall be approved by the Commissioner "unless he finds that such filing does not meet the requirements of this act or establishes an unreasonable, excessive or unfairly discriminatory rate." In the event the Commissioner disapproves a filing, "he shall specify in what respect he finds such filing does not meet the requirements" of K.S.A. 40-1806 or 40-1906.

Corporations have 30 days from the date of any disapproval to request a hearing. Both statutes provide:

"All rates, filed pursuant to this section, shall be made in accordance with the following provisions: (a) Due consideration shall be given to (1) past and prospective loss experience; (2) past and prospective expenses; (3) adequate contingency reserves; (4) the provisions of contracts between such corporation and participating hospitals; and (5) all other relevant factors within and without the state;

"(b) Risks may be grouped by classifications for the establishment of rates for individual policies or for group policies;

"(c) Rates shall be reasonable, not excessive and not unfairly discriminatory." K.S.A. 40-1806 and 40-1906.

These sections go on to provide that nothing in either act is intended to prohibit or discourage reasonable competition or discourage or prohibit uniformity of rates. The Commissioner is authorized to "issue such rules and regulations as are necessary and not inconsistent with" the acts. (None have been issued.) The sections go on to provide for an appeal from the Commissioner's order. The order of the Commissioner may be set aside in whole or in part "on the ground that said order or action is unlawful or unreasonable."

Under the 1972 legislative changes in K.S.A. 40-1806 and 40-1906, the Commissioner of Insurance of Kansas has been given authority to examine rate filings of mutual nonprofit hospital and medical service corporations. If a rate filing does not meet the statutory requirements of the act or if it establishes an unreasonable, excessive or unfairly discriminatory rate the Commissioner may disapprove the rates. Disapproval must be in writing. On disapproval the Commissioner is required to specify in what respect he finds such filing does not meet the requirements of the statutes. The purpose of this is to enable a corporation to correct any oversight or deficiency in a filing, and thereby obtain any necessary change in its rates with a minimum loss of time and expense.

A company cannot correct a filing without knowing what specific things need changing to gain the approval of the Commissioner. Of course, if the changes required by the Commissioner are unlawful or unreasonable, the corporation's only recourse is to appeal to the court.

Now let us turn to the facts of the present case. In August 1978, BCBSK filed proposed 1979 rates, previously approved by their two boards, together with the documents and information required by K.S.A. 40-1806 and K.S.A. 40-1906 to support the filings. The percentage increase requested varied from classification to classification. For all classifications combined Blue Cross sought a rate increase of $13,048,000.00 or approximately 8%. Blue Shield sought a rate increase of $8,892,000.00, or approximately 7.5%. Within 30 days the Commissioner disapproved these filings and requested certain additional information which

was thereafter provided by BCBSK. Then, in 21 letters dated October 3, 1978, the defendant Commissioner disapproved all 21 rate filings and in each instance justified disapproval by merely reciting language from the statutes.

On October 11, 1978, the plaintiffs requested a hearing pursuant to K.S.A. 40-1806 and 40-1906. The hearing was held by the Commissioner's staff on October 30 through November 1, 1978. Evidence was presented by BCBSK in support of the proposed 1979 rates. Evidence was presented by attorneys and other staff members employed by the Commissioner in opposition to the rate increases. On November 22, 1978, the defendant again disapproved all 21 proposed rates for 1979.

The 21 proposed rate increases related to various risk classifications that have been developed by BCBSK over the years. The initial policies in 1942 and 1945 were issued under a uniform rate for all classes of people. However, certain classifications developed a higher utilization rate than others. Thus, with the passage of time and with the increase in competition from commercial insurance companies BCBSK found that it was necessary to rate by risk in order to meet the competition.

The proposed rate increases also reflect a determination by the Blue Cross and Blue Shield boards that one group of subscribers should not be subsidized by another group by paying a rate that does not cover all claims and expenses related to that group. A portion of the total operating expenses of the two plans was allocated to each classification. The Commissioner, in fact, specifically found that BCBSK "have allocated loss and expense experience to Plan 65, community rated classifications, and the other classifications in a manner designed to make the rates for such classifications self-sustaining." Plan 65 coverage is that which is issued to individuals covered by Medicare and Medicaid programs and is complementary to the benefits available under those programs. Community rating means that the experience of all groups of less than 25 individuals in all Kansas counties is pooled and a rate developed from that pooled experience.

In previous years BCBSK submitted rate filings for Plan 65 and community rated groups that were not developed on a self-sustaining basis. BCBSK are in the same market as commercial health insurance companies and their rates and benefits must be competitive. Because of that, each board of directors determined

that each category of membership should be self-sustaining and the categories that had not in the past paid their own way should no longer be subsidized by other subscribers. The Commissioner, however, took exception with that methodology as to Plan 65 and the community-rated classifications.

Also included in the rate filings was a factor to increase the contingency reserves for each of the plans. Contingency reserves are an amount of money measured in terms of months that BCBSK could continue to pay claims and operating expenses if there were no additional income. Reserves are necessary to compensate for such factors as an underestimation of claims and to keep the plans in sound financial condition. The national membership standard for both Blue Cross and Blue Shield requires a contingency reserve equal to three months of claims and operating expenses. Seven or eight of the plans in this part of the country in the past had a three-month contingency reserve. Two or three plans traditionally maintain a three-month contingency reserve.

The Blue Cross and Blue Shield boards determined, as a management decision, that additional contingency reserves were required to ensure the solvency and financial stability of the plans. Included in the rate applications for 1979 were factors which, at the end of said year, would have made a projected reserve of 2.34 months of claims and operating expenses for Blue Cross and 1.45 months for Blue Shield. Without the proposed increase the contingency reserve of Blue Shield was projected to drop to .6 months. The Commissioner determined that the contingency reserve levels projected by Blue Cross-Blue Shield were adequate without a rate increase.

The Commissioner also determined that the proposed rates were unreasonable and excessive based in part on administrative expenditures that "are not conservative." The Commissioner stated that BCBSK's "philosophy for administrative expenditures for fringe benefits, salary increases, travel allowances, and building improvements has failed to reflect conservative measures." No particular expenditure is identified in the order. The Commissioner also stated that in past rate filings Blue Cross-Blue Shield relied upon accelerated depreciation that "has caused administrative expenses to be inflated." But, according to the Commissioner's testimony presented at the hearing, Blue Cross-

Blue Shield now utilizes straight-line depreciation in accordance with a suggestion of the Commissioner and the expense figure for depreciation in the rate filings in question was not computed on an accelerated basis.

As previously stated BCBSK made 21 separate filings on different risk classifications asking for increases in rates to be charged on each of the 21 risk classifications. The Commissioner by separate letters disapproved all 21 filings and gave identical reasons for disapproval of each of the 21 filings. The Commissioner stated:

"Such filing does not meet the requirement of K.S.A. 40-1806 [or K.S.A. 40-1906] in the following respects:

"(1) The supporting information submitted does not justify that due consideration was given to the provisions of subsection (a) of the third paragraph of K.S.A. 40-1806;

"(2) The proposed rates are based upon unreasonable and unfairly discriminatory methods of establishment of classes for both individual and group policies.

"(3) The supporting information submitted does not fully contemplate all factors pertinent to the establishment of adequate contingency reserves and thus the filing results in the establishment of unreasonable, excessive and unfairly discriminatory rates;

"(4) The supporting information does not justify that its provisions of contracts between your corporation and participating hospitals contemplate reasonable provisions designed to achieve rates that are not reasonable, not excessive and not unfairly discriminatory."

The first question to be decided is whether these four conclusory statements were sufficient to comply with the requirements of K.S.A. 40-1806 and K.S.A. 40-1906 which provide:

"In the event the commissioner disapproves a filing, he shall specify in what respect he finds such filing does not meet the requirements of this section . . . ."

The decision of any administrative body should contain a finding of the pertinent facts on which it is based in order for the reviewing court to determine whether the decision reached is reasonable and lawful. *Neeley v. Board of Trustees, Policemen's & Firemen's Retirement System,* 205 Kan. 780, Syl. ¶ 5, 473 P.2d 72 (1970). An administrative agency must assume the responsibility of expressing the basic facts on which it relies with sufficient specificity to convey to the parties, as well as to the court, an adequate statement of the facts which persuaded the agency to arrive at its decision. Thus, there must be findings on all applicable standards which govern the agency's determination, and

the findings must be expressed in language sufficiently definite and certain to constitute a valid basis for the order, otherwise the order cannot stand. *Kansas Public Service Co. v. State Corporation Commission,* 199 Kan. 736, 744-745, 433 P.2d 572 (1967). Findings of ultimate fact expressed in the language of the applicable statute are not enough in the absence of basic findings to support them. *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. 223, 230, 440 P.2d 660 (1968).

Thus, as this court has recognized, one of the purposes for requiring specific findings is to provide a guide to the parties as to the basis for the agency's decision. That is of obvious importance in a case such as this because the Commissioner's findings could serve as a precedent for future rate filings and should, therefore, provide adequate guidelines to BCBSK.

The conclusory statements of the Commissioner in disapproving all 21 rate filings were insufficient to comply with the requirements of K.S.A. 40-1806 and K.S.A. 40-1906. Merely finding fault with the rate filings in general terms of the statute is not sufficient. The Commissioner is under an obligation to specify any deficiencies and omissions he finds in the rate filings so as to give the companies some guidelines for future or amended filings. These findings are especially necessary and critical where, as here, the agency has not established agency rules and regulations to assist those who must file rates with the Commissioner. If the Commissioner merely disapproves the filings in the general conclusory terms of the statute, without specifying his reasons, he is not fulfilling his function under these statutes. If this court were to approve this practice it would force the companies to request and conduct a formal rate hearing in every case where a rate filing is disapproved regardless of the nature of the error in such filing. If specific reasons for disapproval are given, the company may then be able to supplement and correct an error or omission in the filing without the loss of time and expense of a formal hearing.

BCBSK contend the Commissioner has no authority to compel them to engage in health cost containment. We disagree. When BCBSK was first organized in 1941 and 1945 the above contention was sound. The statutes merely provided for the rates to be filed and nothing more. Now, however, under the 1972 changes in the law the rates not only must be filed but they must be approved

by the Commissioner before they may be put into effect. Certain guidelines are set forth in the statutes to arrive at proper rates. K.S.A. 40-1806 and K.S.A. 40-1906 provide that such rates shall be made in accordance with certain provisions. Due consideration shall be given to (1) past and prospective loss experience; (2) past and prospective expenses; (3) adequate contingency reserves; (4) the provisions of contracts between such corporations and providers of health and medical service care; and (5) all other relevant factors within and without the state. A proper rate must be reasonable, not excessive and not unfairly discriminatory.

Examination of the statutory history of K.S.A. 40-1806 and K.S.A. 40-1906 tends to show a growing concern by the legislature over rising health care costs. K.S.A. 1979 Supp. 40-1811 and 40-1911 of the nonprofit hospital and medical service acts provide for maximum percentages of subscriber's payments which may be paid during one year for administrative expenses. For Blue Cross the statutory maximum is eight per centum (8%). For Blue Shield the statutory maximum is twelve per centum (12%) of the payments received from subscribers.

The Commissioner has the duty and obligation in rate filings to restrict BCBSK so as to enforce those maximums set by the legislature. In any case where BCBSK have established that they have remained below the statutory maximums it is presumed that their administrative expenses are reasonable. If they exceed the statutory maximums the rate increases sought should be disapproved. In order for the Commissioner to overcome this presumption of reasonableness there must be evidence introduced and he must be able to find therefrom that the administrative expenses are unreasonable and excessive in comparison to the expenses of other hospital and medical service corporations of similar size and delivering the same types of service. *In re Rate Filing of Blue Cross Hospital Service,* ___ W. Va. ___, 214 S.E.2d 339, 343 (1975). No such evidence was introduced in the present case.

The Commissioner found that the fast depreciation philosophy of BCBSK had caused their expenses to be inflated in 1979 filings. The evidence was that a new addition had been built some years ago to house a necessary increase in employees in the central office in Topeka, that for the first few years thereafter accelerated depreciation had been taken on a declining balance

method. However, the Commissioner had complained of this in a past rate filing, a change was then made, and the building was thereafter being depreciated on a straight-line basis. A straight-line basis was used for the period here involved. The findings of the Commissioner clearly establish that the practice of taking fast depreciation had been discontinued. It would appear the former practice would not be relevant in rate filings for 1979 and years subsequent to its discontinuation.

The Commissioner complained that BCBSK were providing pension benefits for their 1200 employees without the employees contributing a percentage toward the pensions, and that salary increases had been given along with liberal travel allowances. The evidence on behalf of the Commissioner indicated that his investigators frowned on certain other practices of BCBSK such as (1) the practice of furnishing coffee to employees, (2) providing a parking lot for employees, and (3) installing a sprinkler system for the grass between the parking lot and the curb. The Commissioner made a finding based on these so-called liberal practices that BCBSK failed to follow "conservative measures consistent with the nonprofit concept" of the companies. He further concluded therefrom that "administrative expenditures which are not conservative are unreasonable and excessive." We do not agree that this is necessarily true. The conclusion of the Commissioner that any administrative expenditures which are not conservative are unreasonable and excessive is not supported by any relevant evidence. One can hardly equate unreasonableness and excessiveness with providing liberal fringe benefits for employees.

BCBSK argue that the Commissioner has no authority to compel BCBSK to engage in health cost containment. We disagree. *In re Rate Filing of Blue Cross Hospital Service,* ____ W. Va. ____, 214 S.E.2d at 344, 345; *Matter of Thaler v. Stern,* 44 Misc. 2d 278, 253 N.Y.S.2d 622 (1964); *Blue Cross v. Insurance Comm'r,* 403 Mich. 399, 270 N.W.2d 845 (1978).

BCBSK further argue that if the Commissioner does have such authority he may not refuse a rate increase without finding either that the provider fees are excessive or that BCBSK have failed unreasonably to engage in cost containment. BCBSK state that they must enter into provider contracts with hospitals and physicians as required by K.S.A. 1978 Supp. 40-1803 and 40-1903. Under these statutes, which were in effect when the 1979 rate

increase request was filed, BCBSK had no direct control over the fees set by those providers. The subscribers' contracts covered service benefits for hospital care and other health services. The only statutory limitations on amounts to be paid for these service benefits appear in K.S.A. 1978 Supp. 40-1803(4) and K.S.A. 1978 Supp. 40-1903(4). These amounts are "not to exceed reasonable and customary charges" that a subscriber may incur for these services. However, these are set up as service payments. When charges for health care are incurred and when they do not exceed the reasonable and customary charges set in the providers' contract they become an obligation of the subscriber and BCBSK and must be paid.

There is an obligation under the statutes for BCBSK in the first instance to determine that the rates the providers charge the subscribers are reasonable, not excessive, and not unfairly discriminatory, and that the service payments made to health care providers be no more than the reasonable and customary charges. Under the written stipulation filed by the parties, cost savings were attained by BCBSK by limitations placed on charges set in provider contracts between BCBSK and their hospital and medical service providers. Through this cost containment practice instituted by BCBSK, subscribers had realized savings of $11,040,600.00 in 1977. This was the last year for which complete figures were available.

The Commissioner adopted a so-called "finding" that BCBSK "have not adequately addressed cost containment provisions" in contracts. The finding was in turn adopted by the district court. This finding is so general in nature it is merely a conclusion. It gives no indication of what was deficient or omitted from the contracts. There are no findings upon which to base this conclusion that BCBSK had failed to address cost containment provisions in provider contracts. The record is devoid of evidence with which to support such a conclusion.

The next question discussed by the contending parties concerns who is to have the final authority to group risks into classifications for the establishment of rates on individual policies and on group policies. The boards of directors of BCBSK approved the group classifications for rate purposes based upon management decisions that one group of subscribers should not, in effect, be required to subsidize another group. One of the high

risk groups formerly being subsidized was Plan 65. In the 1979 rate filing BCBSK made the rates for Plan 65 and other groups self-sustaining. This had the effect of raising the rates for those subscribers in high risk groups. The Commissioner objected to making the rates for each group self-sustaining and insisted that other classifications be allocated a part of the claim and operating expense experience of Plan 65, so as to subsidize the costs of the plan at the expense of other groups. Failure to subsidize was found by the Commissioner to result in rates which were unreasonable, excessive or unfairly discriminatory. It appears to us that the opposite might be true.

Many factors go into deciding on the establishment of any group for rate making purposes. From a management position one of the most important factors has to do with maintaining a competitive market position. If a group rate is too high the company is priced out of the market and if the group rate is too low a company may find itself saddled with too large a number of low rate-high risk subscribers. The statutes, K.S.A. 40-1806 and 40-1906, mention certain guidelines in making filings with the Commissioner. Both statutes provide:

"All rates, filed pursuant to this section, shall be made in accordance with the following provisions: (a) Due consideration shall be given to . . . .

"(b) Risks may be grouped by classifications for the establishment of rates for individual policies or for group policies;"

This wording in these statutes is directed toward the hospital and medical service corporations, such as BCBSK. The legislature used the permissive word "may" in authorizing such corporations to group risks by classifications. The grouping of risks is a management decision, one which is tied directly to maintaining a competitive market position with other corporations with which they compete for business. The Commissioner should not substitute his judgment for that of the directors of BCBSK when it comes to grouping and classifying risks for the purpose of establishing rates on individual policies or on group policies.

Nonprofit hospital and medical service corporations operate in the area of public service and are subjected to a measure of statutory control in the hands of the Insurance Commissioner. The public service rendered by such health care organizations and the control thereof by the Commissioner is analogous to that of the public common carriers under control of the Kansas Cor-

poration Commission. A public utility such as a common carrier is required to establish just and reasonable rates that are not discriminatory. K.S.A. 66-107; *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 10, 565 P.2d 597 (1977). In *Jones* it is stated in Syl. ¶ 10, "The touchstone of public utility law is the rule that one class of consumers shall not be burdened with costs created by another class." The same is true with regard to rates set by nonprofit hospital and medical service corporations. K.S.A. 40-1806(*c*) and 40-1906(*c*). In *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 391, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979), Chief Judge Foth in considering a case involving allocation of costs states:

"If the . . . evidence indisputably demonstrates that a rate structure in fact imposes on one class costs created by another, the rate structure cannot withstand the test of *Jones.*"

We believe this same philosophy should be applied in fixing rates for different groups of health care subscribers being served by nonprofit hospital and medical service corporations whose filings are subject to the scrutiny and approval of the Insurance Commissioner. In establishing rates for individual or group policies under K.S.A. 40-1806 and 40-1906, risks may be grouped by classifications of health care subscribers and in fixing rates for one class or group such class or group should neither be subsidized nor have to bear part of the burden of subsidizing another group or groups. Cost overlapping may occur and exactness in determining every expense incurred for a particular group may not be feasible or practical; however, the goal should be that one risk group should not be subsidized at the expense of others.

Under K.S.A. 1979 Supp. 40-1809 and 40-1909 BCBSK are made subject to some of the same statutory regulations that insurance corporations are. However, the Insurance Commissioner should keep in mind that neither the general insurance laws nor the laws governing nonprofit hospital and medical service corporations give him authority to govern the everyday management details of BCBSK, or to substitute his judgment for that of the boards of directors of these companies as to either the wisdom and expediency of business policies or the methods of carrying on the business of the companies. 19 Appleman, Insurance Law and Practice § 10394, pp. 74, 75 (1946). See also *Hutchins Mut. Ins. Co. v. Hazen,* 105 F.2d 53, 57 (D.C. Cir. 1939).

The next question raised on appeal is whether failure to consider group reserves plus the use in this case of a built-in figure for deficiency reserves to increase such reserves to an amount approaching three months of claims and operating expenses would result in authorizing unreasonable, excessive or unfairly discriminatory rates. The Commissioner of Insurance found that it would, based on the conclusions reached by Anthony J. Houghton, an expert witness. However, this witness testified his expertise in the area of business reserves came from his knowledge of the internal operations of ordinary insurance companies, not Blue Cross-Blue Shield plans. He referred to the size of a necessary deficiency reserve in terms of percentages of annual premiums rather than in months of claims and operating expenses. He stated: "I don't think specifically that 5 percent of the year or 3 months is a required objective for this plan, nor do I believe that a contingency contribution built into rates of 3 percent to 5 percent is necessary to fund for that level or to that level that they do need, but I don't know a specific number that I would recommend." The Commissioner introduced no evidence of the amount of deficiency reserves which other Blue Cross-Blue Shield plans were maintaining. So the testimony from the expert who admittedly knew little about BCBS plans and who would not recommend a figure for a proper reserve was somewhat suspect.

On the other hand, BCBSK introduced testimony that they were members of the National Association of Blue Cross-Blue Shield Plans and that use of the BCBS name and logo requires compliance with standards promulgated by the national organization. Those standards require a contingency reserve of three months. Seven or eight plans in this area of the nation traditionally maintain a reserve of three months and several other plans from time to time have been able to do so. When reserves are expressed in terms of months it refers to an amount in dollars sufficient to pay claims and operating expenses during that period if no income were to be received by the plan.

In 1976 the Blue Cross reserve level originally projected before the year began was 1.6 months. The actual reserve level at the end of the year was 1.31 months. In 1977 the reserve level originally projected before the year began was 1.39 months. The actual reserve level at the end of the year was 2.01 months of claims and expenses. In 1978 the reserve level originally projected was 1.23

months and one year later the reserve level projected was 2.08 months. With the increase in rates requested for 1979 the reserve level originally projected for Blue Cross was 2.34 months. This was .66 of a month below the three months required by national membership standards.

For Blue Shield in 1976 the reserve level originally projected was .9 of a month, and the actual reserve level for that year came to .56 of a month. In 1977 the reserve level originally projected was .92 of a month, and the actual reserve level for that year came to 1.15 months. In 1978 the reserve level originally projected was .94 of a month, and the reserve level projected one year later was 1.08 months. With the increase in rates requested for 1979, the projected level of reserves for Blue Shield was 1.45 months, and without the increase it amounted to .57 of a month.

From these historical figures the Commissioner found that BCBSK had underestimated the reserves projected in past filings and that underestimation probably occurred in the 1979 filings. In addition there was evidence that in arriving at the deficiency reserves BCBSK had overlooked or omitted certain group reserves which would increase the reserve levels projected for 1979 by .2 of a month. By adding .2 of a month it would increase the deficiency reserve level projected for Blue Cross for 1979 to 2.54 months, and for Blue Shield for 1979 to 1.65 months.

Considering the entire record on the issue of what is a reasonable level for deficiency reserves, we find that the Commissioner's witnesses failed to give testimony as to what would be a reasonable level for deficiency reserves. Mr. Houghton merely testified that he did not think five percent of annual premiums of three months of claims and operating expenses would be a required objective for these plans. In addition we find no evidence introduced as to what increases in individual or group rates would result from such increases in deficiency reserves. The only evidence on the issue as to what would be a proper level for deficiency reserves was the evidence of BCBSK. Their testimony established that three months of claims and expenses was a standard reserve required by National Blue Cross-Blue Shield for membership. They introduced additional testimony that other plans in this area were maintaining reserves at that level. After examining the record we conclude the Commissioner's findings Nos. 22, 23 and 24 as to excessive deficiency reserves are wholly unsupported by the evidence.

Throughout this appeal BCBSK questions the statutory authority of the Commissioner. The Commissioner of Insurance has a statutory duty and authority under K.S.A. 40-1806 and 40-1906 with regard to rate filings of nonprofit hospital and medical service corporations (1) to determine the accuracy of trend projections and the reasonableness of prospective loss experience used in the filings, (2) to consider past and prospective expenses relevant to the filings, (3) to determine what are adequate contingency reserves for these corporations, (4) to consider the provisions of contracts between such corporations and their participating health care providers, and (5) to consider all other relevant factors bearing on rates, to the end that all rates provided for in the filings are reasonable, not excessive and not unfairly discriminatory.

In conclusion we note that the rate filing with which we are here concerned is for rates to be charged subscribers for the year 1979. That period has now passed. Premiums for 1979 have already been paid on the basis of rates approved in prior filings. We understand from statements made during oral arguments that a subsequent rate filing was made, and certain increases of rates were authorized and put into effect. Under these circumstances it would appear to be futile to remand the case to the Commissioner of Insurance to reconsider the 1979 rate filing. Therefore this case must be considered only a declaratory judgment action.

The judgment of the district court affirming the order of the Commissioner of Insurance is reversed.