239 N.J. Super. 434 (1990)
571 A.2d 985
IN THE MATTER OF THE NOVEMBER 14, 1989, NON-GROUP RATE FILING BY BLUE CROSS AND BLUE SHIELD OF NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 1990.
Decided March 16, 1990.
*435 Before Judges PRESSLER, LONG and GRUCCIO.
John V. Jacobi, Assistant Deputy Public Advocate, argued the cause for appellant The Public Advocate (Thomas S. Smith, Jr., Acting Public Advocate, attorney; John V. Jacobi, on the brief).
Clyde A. Szuch argued the cause for respondent Blue Cross & Blue Shield of NJ (Pitney, Hardin, Kipp & Szuch, attorneys; Dennis R. LaFiura, Elizabeth J. Sher, Peter J. Herrigel, on the brief).
Donald Parisi, Deputy Attorney General, argued the cause for respondent Commissioner of Insurance (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Michael R. Clancy, Assistant Attorney General, of counsel; Donald Parisi, on the letter brief).
Deborah A. Ellis argued pro hac vice the cause for amici curiae ACLU-NJ, ACLU Women's Rights Project, NOW-NJ, NOW Legal Defense and Education Fund, National Clearinghouse for Ending Sex Discrimination in Insurance, and Women's Political Caucus of NJ (Annamay Sheppard, attorney; Deborah A. Ellis, on the brief).
Walter R. Bliss, Jr., argued the cause for amici curiae NAACP Legal Defense and Educational Fund, Inc., NJ Citizen Action, NJ Council of Churches, NJ State AFL-CIO, NJ Public Health Association, NJ State Conference of NAACP Examiners (Walter R. Bliss, Jr. attorney; Walter R. Bliss, Jr. and Alison Wetherfield, of counsel and on the letter brief; Julius Levonne *436 Chambers, Charlotte Rutherford and Marianne Engelman Lado, on the letter brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The Public Advocate appeals from a final order entered by the Commissioner of Insurance on January 10, 1990, approving an average 24.6 percent increase in the rates Blue Cross and Blue Shield of New Jersey, Inc. (BCBS) may charge for all of its non-group contracts. The primary thrust of the Public Advocate's challenge attacks the Commissioner's approval of a demographic rating system for non-group subscribers. The Public Advocate contends that demographic rating contravenes the New Jersey Constitution's equal protection guarantees, public policy, and the BCBS enabling statute. We agree that the enabling statute N.J.S.A. 17:48E-1, et seq., adopted in 1985 and amended in 1988, does not authorize BCBS's asserted right to depart from its historical community rating of non-group contracts. Consequently the Commissioner was without authority to approve rates for those contracts based on any other rating scheme. We therefore reverse the order appealed from.
An understanding of the narrow issue on which we base our decision requires a brief foray into the statutory background and business practices of BCBS. Prior to the adoption of N.J.S.A. 17:48E-1, et seq., by L. 1985, c. 236, the statutes authorized separate hospital service corporations and medical service corporations. N.J.S.A. 17:48-1, et seq., and N.J.S.A. 17:48A-1, et seq., respectively. These statutes provided for the formation of non-profit corporations to be operated for the benefit of their subscribers. Blue Cross of New Jersey and Blue Shield of New Jersey were the only corporations ever organized under this legislation, and their investment with the public interest, as intended by the statutes, has never been in doubt. Thus, in Borland, et al. v. Bayonne Hospital et al., 122 N.J. Super. 387, 300 A.2d 584 (Ch.Div. 1973), aff'd 136 N.J. *437 Super. 60, 344 A.2d 331 (App.Div. 1975), aff'd 72 N.J. 152, 369 A.2d 1 (1977), cert. den. 434 U.S. 817, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977), the court construed N.J.S.A. 17:48-1 et seq. as
designed particularly to accomplish the purpose of a broad-based community health program, i.e., to satisfy the needs of the hospitals and the community as a whole through a partnership between hospitals and a non profit prepayment plan. [122 N.J. Super. at 398, 300 A.2d 584]
After quoting the observation of the Final Report of the New Jersey Blue Cross Rate Study Commission that "[t]he basic philosophy of Blue Cross has always been that of constant progress toward the goal of complete protection against the unpredictable costs of hospital services for all the people of the community," the court further explained that:
The goals and objectives of this partnership are: (a) to provide to the public a payment-in-advance method for financing care provided by hospitals and to guarantee payment to the hospitals; (b) to make hospital care needed by the public financially accessible to the largest number of people at the lowest possible cost, and (c) to help the community carry the social and economic burden created when people are unable to pay for the necessary care rendered by hospitals. [Id. at 399, 300 A.2d 584]
And in affirming the lower courts in Borland, Justice Sullivan began with the proposition that Blue Cross, in its organization and operation is "clearly * * * affected with a public interest." 72 N.J. at 158, 369 A.2d 1. See also, reiterating the essentially public mission of Blue Shield, Radiological Society of N.J. v. Sheeran, 175 N.J. Super. 367, 375, 418 A.2d 1300 (App.Div. 1980), certif. den. 87 N.J. 311, 434 A.2d 66 (1981).
In 1985, the Legislature enacted the Health Service Corporations Act, N.J.S.A. 17:48E-1, et seq., which, in effect, provided for the merger of Blue Cross and Blue Shield into a single corporate entity.[1] BCBS was incorporated in February 1986 under that statute as the only health service corporation in this State, replacing the two separate entities.
*438 The public purposes assigned to a health service corporation established under N.J.S.A. 17:48E-1, et seq., are identical to those which had been committed to the separate predecessor corporations. BCBS continues as a non-profit corporation operated for the benefit of its subscribers and enjoying state tax-exempt status. N.J.S.A. 17:48E-3(a),-41. Moreover, a health service corporation is required to "maintain a continuous open enrollment period, providing coverage to persons who are otherwise unable to obtain hospital, medical-surgical, or major medical coverage." N.J.S.A. 17:48E-3(d). Its rates are not permitted to be "excessive, inadequate, or unfairly discriminatory...." N.J.S.A. 17:48E-27. BCBS is, consequently, the health insurer of last resort, enabled to perform this mission not only by reason of its non-profit, tax-exempt status, which affords it a substantially greater leeway than commercial insurers have both in respect of coverage eligibility and in contract rates, but also by reason of the provider discounts it receives from hospitals, see Borland, supra, and by reason of its controlled administrative expenses resulting from the restrictions and limitations imposed by N.J.S.A. 17:48E-17.
BCBS, like its predecessors, offers two basic types of contracts, group and non-group. There are three categories of non-group contracts, those covering a single individual, those covering a single parent and children, and those covering families. Hospital, medical-surgical and major medical coverages are available to each of these categories. There are additional subcategories. First, there is so-called complementary coverage and non-complementary coverage. Complementary coverage, which supplements Medicare, offers three types of contracts, denominated, in ascending order of benefits, BCBS 65, Select and Super 65. Non-complementary coverage is available to "regular" subscribers, those who were formerly group members ("left group"), students, and high risk subscribers ("Coop"). BCBS also offers two higher benefit packages it denominates as "Medallion" and "Blue Care." The rate increase approval now before us encompasses all these non-group contracts, *439 also referred to as individual contracts, community contracts and consumer contracts. There are presently outstanding some 425,000 such contracts covering nearly 600,000 people.
Historically, distinct rating methodologies have been statutorily prescribed for group and non-group contracts. Under the predecessor legislation, groups of 50 or more were permitted to be experience rated. That is, subject to formulas approved by the Commissioner of Insurance, each group's annual premium was effectively based on its own claim experience for the prior year. N.J.S.A. 17:48-6.9, 17:48A-7.9. Non-group contracts and contracts covering groups under 50 (small groups) were required to be community rated, that is, every subscriber within the state pays the same rate for the same coverage.[2] Consequently all parties agree that under the two original statutes demographic rating, that is, rating of subscribers based on statistical risk factors, was not permitted although commercial health insurers typically use such rating systems. All parties also agree that N.J.S.A. 17:48E-1, et seq., as originally enacted in 1985, adhered to the same dichotomy, namely, mandatory community rating for all non-group and small-group contracts and permitted experience rating for groups of 50 or more. The question of statutory construction now before us is whether the 1988 amendments to N.J.S.A. 17:48E-1, et seq., effected by L. 1988, c. 71, eliminated the community rating mandate for non-group contracts, thereby authorizing the demographic rating scheme that the Commissioner permitted BCBS to implement.
*440 In deciding this question, we address first the events preceding and resulting in the 1988 amendments. As this record makes clear, BCBS, like its predecessors, had operated on a financially sound basis until 1986. Its annual statements for fiscal 1986 showed an underwriting loss before investment income of $96 million and for fiscal 1987 a loss of $177 million. By the end of 1988, it reported a plan deficit of $278 million, $203 million attributed to group contracts and $75 million to non-group contracts. This deficit, however, was estimated to be reduced to $219 million by the end of 1989, $61 million of which was attributed to non-group contracts. These losses, according to consulting actuaries retained by the Commissioner, were primarily due to a combination of BCBS's actuarial miscalculations and a variety of circumstances beyond its control, including federal Medicare cutbacks that resulted in larger than anticipated rate increases allowed by the Hospital Rate Setting Commission.[3] BCBS's fiscal problems during this period led to the Commissioner's approval of several rate increase requests. But, as the Commissioner himself pointed out in the Final Decision and Order now under review, these increases further exacerbated BCBS's financial problems by causing a large number of subscribers to drop coverage, because, as he surmised, either the coverage was too expensive for the poor or near-poor to afford or low risk subscribers were able to obtain equivalent coverage with lower rates from commercial carriers, or because of an unquantified combination of the two.
In any event, the Legislature, obviously concerned about the continued financial viability of BCBS, responded by the enactment of L. 1988, c. 71 which amended N.J.S.A. 17:48E-1, et seq. The act evidently was intended both to give BCBS some immediate fiscal relief and to insure its future solvency. The first *441 salient feature of the act was its repeal of N.J.S.A. 17:48E-17(e) and (f), which had addressed the required special contingent surplus and its replacement with a new provision, N.J.S.A. 17:48E-17.1, mandating among other provisions, the submission of a plan to the Commissioner for meeting its redefined contingent surplus requirements. The second was the amendment of N.J.S.A. 17:48E-26 to permit experience rating, based on "past or projected" experience and utilizing appropriate "claim costs and utilization trend factors" for groups of at least two  that is, for all groups. The third was the adoption of N.J.S.A. 17:48E-27.1, providing for a form of automatic approval of rate-increase requests by requiring the Commissioner to act within 45 days after filing. The fourth was an amendment of N.J.S.A. 17:48E-26(d) permitting, subject to an automatic 20-day approval period, rate increases for both individual and group contracts not experience rated to reflect increases in hospital payment rates allowed by the Hospital Rate Setting Commission pursuant to N.J.S.A. 26:2H-4.1. The fifth and final major feature was the creation by L. 1988, c. 71, § 8, not codified, of a Study Commission to study Health Service Corporations and to which a specific agenda was assigned by §§ (b) and (c).
The 1988 amendments did not, in express terms, either authorize demographic rating of non-group contracts or eliminate or modify the historical, commonly understood and long-since accepted predicate of mandatory community rating of those contracts. Based on a statutory construction argument we address with specificity hereafter, BCBS nevertheless interpreted the 1988 amendments as permitting demographic rating of non-group contracts and, in November 1988, it sought a rate increase based thereon. The Public Advocate, in the rate-counsel role assigned to him by N.J.S.A. 52:27E-16 to 20, objected to this rate-setting method, but did not appeal the Commissioner's approval. On November 14, 1989, BCBS sought an additional increase, again based on demographic rating, this time asking for an average 32 percent in non-group contract rates. It is *442 from the Commissioner's approval of a 24.6 percent average increase so based that the Public Advocate now appeals.
A further word about demographic rating. As noted, it is a premium-setting system based on statistically projected risk factors. The BCBS system is based on three demographic factors, age, gender, and place of residence. A total of 40 separate categories was established by the creation of five age classifications, the two gender classifications, and four geographical classifications, by which designated contiguous counties are grouped on a risk-predictive basis. The 40 categories are then assigned to one of five basic risk classes, designated alphabetically in ascending order of risk, from A to E. The premiums for coverage are then calculated based on the risk category to which the subscriber is assigned.
The intended effect of demographic rating is to create a premium structure that favors good statistical risks and burdens high statistical risks. The Commissioner, in his Final Decision and Order, recognized that as a consequence of demographic rating many statistically high risk subscribers, particularly the less economically advantaged, would be driven out of the BCBS pool by reason of unaffordable premiums and would consequently become uninsured. He nevertheless approved the demographic rating scheme[4] because he was "not convinced that demographic rating is contrary to the statutory mission of Blue Cross and Blue Shield" and because he concluded that demographic rating would contribute to BCBS's financial viability by averting what is known as the anti-selection spiral. This *443 is a phenomenon in which the better risks in the aggregate pool are able to obtain equivalent coverage from a commercial carrier. Their consequent withdrawal from the pool leaves a greater and greater proportion of high risks, resulting in proportional decline in the premium/claim ratio, the eventual "collapse" of the pool, and potential financial disaster, or at least impairment, as the Commissioner phrased it, of the Blue Cross and Blue Shield "ancillary" mission, "embodied in corporate tradition and public perception, as well as in statute, of providing available and affordable health insurance through open enrollment and `service benefits' programs."[5]
The Public Advocate's challenges to the demographically-based rate increase-approval may be summarized as follows. He claims that demographic rating contravenes N.J.S.A. 17:48E-1, et seq., and Art. I, par. 1 of the New Jersey Constitution. He also asserts that there was an insufficient basis in the record before the Commissioner to justify his conclusion that there is a present and substantial threat to BCBS's financial viability by reason of an asserted anti-selection spiral and that, in any event, BCBS failed to demonstrate the statistical and actuarial soundness of its particular demographic rating scheme. Finally, the Public Advocate contends that the Commissioner mistakenly exercised his discretion in denying the Advocate's request for a 10-day extension to complete the required rate-counsel review, analysis, and report. The group of amici curiae led by the American Civil Liberties Union focuses its challenge on the assertion that the use of a gender risk factor in the construction of the demographic rating scheme violates the State Constitution's equal protection guarantee. The group of amici curiae led by the NAACP Legal Defense Fund focuses its challenge on the assertions that demographic rating contravenes the public purpose of N.J.S.A. 17:48E-1, et seq., and that the BCBS construct constitutes *444 effective racial discrimination in violation of constitutional and statutory prescriptions by concentrating the premium burden on African American residents of this state, a majority of whom would by reason of relevant demographics, fall into high risk categories.
Although we find considerable merit in the well-reasoned constitutional arguments of the amici and in the "rush to decision" argument of the Public Advocate, we do not reach them because we are persuaded that the Legislature did not, by its 1988 enactment on which BCBS exclusively relies, intend to alter or effect an alteration of the community rating predicate for non-group contracts. Hence the Commissioner's action in approving a demographic rating system contravened the statute. It is for that reason alone that we reverse his order, noting the pertinence of Justice O'Hern's recent observation that "we do not sit here as a super legislature, nor do we concern ourselves with the wisdom of the administrative choices. Rather, we view this matter as within our proper role of deciding questions of legislative intent." Matter of Rulemaking, N.J.A.C. 10:82-1.2, 117 N.J. 311, 326, 566 A.2d 1154 (1989).
In attempting to ascertain the legislative intent expressed in the 1988 act, we must first place that act in the context of BCBS's statutory raison d'etre, identified by the Commissioner himself of "providing available and affordable health insurance through open enrollment and `service benefits' programs." With respect to non-group contracts, it is at once obvious that community rating promotes this goal and that demographic rating impedes it by either pricing coverage beyond the reach of low and moderate income subscribers or requiring them to purchase coverage at the sacrifice of other necessities. We further note that the actuarial burden to the insurer of community rating, which is critical to the goal of maximum affordability, has historically been viewed as offset by the tax exemptions *445 and the other special benefits health service corporations enjoy to which we have already alluded.
The United States General Accounting Office prepared an illuminating report in 1986 for the Chairman of the House of Representatives Subcommittee on Health of the Committee on Ways and Means addressing the question of continued federal tax exemption for health service corporation plans. The Report explains that:
IRS has recognized the exemption of the plans as social welfare organizations since their inception in the 1930's. These exemptions were initially recognized when the plans pioneered health insurance, offering one community rate to all subscribers. At that time, lack of information on the actuarial soundness of this type of venture deterred commercial companies from underwriting the costs of hospital care. After commercial companies entered the field in the 1940's, a competitive for-profit health insurance industry developed. [GAO/HRD-86-110 at 1]
The Report then makes clear that with the advent of experience rating for groups there is increasingly less difference in the underwriting practices of the commercial carriers and the health service corporations in respect of this line of business, which is in fact the major line of health insurers. The current battleground is over non-group contracts and the extent to which the non-profit corporations are permitted to and in fact do emulate the commercial insurers by risk-rating individuals. The Report's thesis suggests that the more closely the rating practices of the non-profit corporations approach those of the commercial carriers, the less reason there is for their continued tax exemption.
Further illustrative of the nationwide battle by the health service corporations for the right to compete with the commercial carriers in non-group rate-setting by abandoning historical community rating for this line of business is the recent disparate litigation experience of Blue Cross/Blue Shield in Kansas and Michigan. In Blue Cross of Kansas, Inc. v. Bell, 227 Kan. 426, 607 P.2d 498 (Sup.Ct. 1980), Blue Cross successfully appealed the State Insurance Commissioner's denial of a rate increase request based on demographic rating. The Kansas Supreme *446 Court reversed the Commissioner, noting that the enabling statute expressly provided that "[r]isks may be grouped by classifications for the establishment of rates for individual policies or for group policies...." 607 P.2d at 502. Michigan's statute, however, like New Jersey's, has no such explicit authorization. Thus in Blue Cross & Blue Shield v. Baerwaldt, 139 Mich. App. 109, 361 N.W.2d 742 (1984), the court affirmed the Insurance Commissioner's action denying a demographically-based rate increase request in the face of Blue Cross and Blue Shield arguments virtually identical to those advanced here. Notably, in addressing the Blue Cross and Blue Shield contention that community rating placed it at a competitive disadvantage with respect to commercial insurers, the court found the argument without merit stating that:
Although BCBSM operates according to principles similar to those of insurance companies, it is not carried on as an insurance business, but rather provides a method for promoting the public health and welfare in assisting persons to budget health care costs. These principles are quite different from those governing commercial insurers. It is neither fair nor reasonable to insist that BCBSM be allowed to adopt any rate structure used by its competitors when BCBSM operates under statutes which give it extremely significant advantages over its competitors in many respects. [Citation omitted] [Id. 361 N.W.2d at 747]
Moreover, with respect to the argument which impressed the Kansas court, namely, that each risk group should pay its own way, the Michigan court had this to say:
BCBSM relies on the principle that each class of customers must pay its own way, and that rates incorporating a subsidy between classes are unfair and unreasonable. This principle, drawn from public utility rate cases, has also been applied to Blue Cross rates. Blue Cross of Kansas, Inc. v. Bell, 227 Kan. 426, 607 P.2d 498 (1980). We disagree with the application of this principle to cases involving Blue Cross rates. In the case of most public utility rates, what a customer pays is dependent upon what he uses. The business of insurance, on the other hand, necessarily involves a far more imperfect assessment of the cost of benefits provided. Where no element of risk-sharing is involved, it is much easier to conclude that subsidies between classes of customers are unfair. [citations omitted] [Id. 361 N.W.2d at 748]
It is against this background and with these perceptions that we consider the Legislature's 1988 action. It is first clear, as we have noted, that its paramount concern was the immediate *447 amelioration of financial crisis that was attendant, for whatever reasons of miscalculation, upon the unanticipated and unplanned-for cost of utilization by the high risk component of the non-group subscriber pool. In addition to insisting on BCBS's development of a financial recovery plan, the primary financial relief the Legislature offered was the authorization for experience rating for small groups, theretofore required, like non-group contracts, to be community rated. The sponsor statement accompanying the act reads in full as follows:
This bill modifies the law regarding health service corporations. It would permit health service corporations to be more competitive in terms of the products which they offer.
The bill would permit health service corporations to own stock in or affiliate themselves with life insurance companies. It would permit experience rating for all group contracts, including those which have two to forty-nine members. It eliminates the prior approval system of rate regulation and substitutes a "file and use system." It would also permit rates to be raised if hospitalization benefit rates are increased by the Hospital Rate Setting Commission.
The bill also provides for the establishment of a plan for bringing a health service corporation's surplus up to adequate levels, and provides for the separation of reserves which are allocable to group and individual accounts, respectively. [Emphasis added]
The news release prepared by the Governor's office reads in full as follows:
Governor Thomas H. Kean today signed legislation amending the law concerning health service corporations (Blue Cross/Blue Shield) to make them more competitive and improve their financial stability.
A-2891, sponsored by Assemblyman Ralph Loveys, R-Morris and Senator Raymond Lesniak, D-Union, allows for "experience" rating. This change will enhance Blue Cross/Blue Shield's competitiveness with commercial insurers.
This bill also gives health service corporations the authority to become affiliated with life, health, or accident insurance companies.
The amended law needed to combat Blue Cross/Blue Shield's current deficit of approximately $200 million.
The legislation is effective immediately. [Emphasis added]
The Assembly Insurance Committee Statement offers a more detailed explanation. Its only reference, however, to any contract rating change appears in its explanation of the modification in respect of small-group contracts. It notes that:

*448 The bill provides for experience rating of small groups of 2 to 49 people. At present, these groups are community rated, which means that their loss experience is combined with the loss experience of others to establish their rate. Experience rating these small groups is designed to make the corporation more competitive with respect to this class of business. This means that the rates for small groups would no longer be subject to the prior approval of the commissioner and that they will be based on the loss experience of the group. For a time, a subsidy will continue to exist between the group business and the individual business. The committee has added language to clarify the fact that the assessment on group business will continue to apply as long as any reduced hospital payment rate applies to the corporation.
It is inconceivable to us that with the care taken by the Legislature to explain its abandonment of community rating for small-group contracts in favor of experience rating in order to make BCBS more competitive with commercial carriers in respect of this class of business, it could also have intended to effect, without any direct statutory language or accompanying explanation at all, the much more fundamental and dramatic change of permitting BCBS to abandon community rating for non-group contracts, a predicate that is at the heart of its open-enrollment mandate. To the contrary, we find the conclusion ineluctable that to the extent it considered such a change, it rejected it for the time being. It is evident to us that the Legislature evaluated BCBS's "need to compete" claims which underlay its desire for permission to experience rate small group contracts and demographically rate non-group contracts. It is equally evident that the Legislature was prepared to accede to the small-group component of BCBS's competitive blueprint, but not to the non-group component.
We base this conclusion on the uncodified provision of the act, heretofore referred to, establishing the Study Commission, L. 1988, c. 71, § 8. As we pointed out, its agenda was specifically assigned. Thus, paragraph (b) required the Commission to "examine long-range issues affecting health service corporations," including, and heading the list, "the future need for community-rated contracts for individuals." We read this directive as a clear acknowledgment that the Legislature was willing to consider an eventual abandonment of community-rating *449 for non-group contracts, but only after careful, deliberate study by industry professionals. That mandate, in our view, belies any present intent to have abandoned community-rating and, a fortiori, precludes any argument that it had already done so. We are satisfied that this conclusion is further buttressed by the Legislature's assignment of agenda to the Commission in paragraph (c), by which the Commission was directed to study "the question of insuring high risk individuals and the feasibility of providing alternate means of coverage for them," considering as options
(1) the creation of a fund made up from the proceeds of a surcharge on employers who are subject to the "unemployment compensation law," R.S. 43:21-1 et seq., for the purpose of subsidizing the insuring of high-risk individuals; and (2) the creation of a program to insure high risk individuals through the payment by all insurers of a surcharge on the hospital payment rates established by the Hospital Rate Setting Commission pursuant to the provisions of P.L. 1978, c. 83 (C. 26:2H-4.1 et seq.), as a subsidy to supplement the premium income generated by that class of risk.
In our view, the juxtaposition of these two directives to the Commission evinces the legislative understanding that the threat, if any, to BCBS's financial soundness was posed by the high-risk segment of the pool but that the way to address the problem was not to permit BCBS to withhold coverage by a risk-rating system but rather by removing this segment from the BCBS community-rating pool only after other protective arrangements had already been devised and were in place.
Moreover, we note the Legislature's continued awareness that the non-group contract line, if not risk-rated on some basis, is unlikely to pay its own way. Thus, from the very beginning, the group contract line was statutorily required to subsidize the non-group line. See N.J.S.A. 17:48-6.9. This provision was continued in the 1985 Act. See N.J.S.A. 17:48E-26(b). It was also retained in the 1988 amendment, the Assembly Committee Statement pointing out:
As originally drafted, the bill would have ended the subsidy of the individual contracts by the group contracts. This was accomplished by creating a "wall" between the surplus accounts of the group contracts and individual contracts. This would force both types of contracts to be subject to a rate structure which *450 was self-supporting. The Assembly Insurance Committee has added language to the bill which provides that loans between the respective surplus accounts may take place until the special contigent surplus account which is applicable to individual contracts has reached the statutorily prescribed amount, or no longer than six years following the effective date of the act, whichever is earlier.
We regard this as a clear expression that the Legislature understood that community rating was remaining in place for non-group contracts and hence that such contracts, unlike group contracts, would not be subject to any kind of self-supporting rate system, be it experience rating, demographic rating or any other deviation from community rating.
Against what we regard as this overwhelming indication of legislative intent to retain community rating for non-group contracts, BCBS insists that the legislature intended the contrary. It relies for this assertion on the observation that the phrase "community-rated" which was used in several sections of N.J.S.A. 17:48E-1, et seq., as originally adopted, was deleted by the 1988 amendments. Thus, N.J.S.A. 17:48E-26(b), originally required assessment of experience-rated groups of "a reasonable community charge." The 1988 amendment redefined the assessment as "a reasonable charge for all individual contracts." N.J.S.A. 17:48E-17(e), deleted in its entirety, had provided "that the special contingent surplus shall be contributed by each of the following two categories: (1) community-rated, excluding open enrollment and conversion groups; and (2) experience-rated subscribers." As we have pointed out, however, that section was replaced in 1988 by N.J.S.A. 17:48E-17.1(a) which requires "two separate special contingent surplus accounts, one for its individual contracts and one for its other activities." Moreover, N.J.S.A. 17:48E-26(d), had originally provided in full:
For experience rated groups of 50 to 99 employees or members, the commissioner shall have the authority to determine that rates charged depart from community rates in such a way as to assure continuity of rating principles with the community rated and experience rated groups of 100 or more.
This subsection was replaced by the 20-day hospital rate increase provision, which refers to "all individual or group contracts" and essentially addresses different substantive matters. *451 N.J.S.A. 17:48E-27 had originally provided for required rate filing for "individual or group contracts which are not experience rated" and for the Commissioner's right to disapprove the "schedule." This was amended in the 1988 Act to require rate filing for "individual contracts" only and to authorize the Commissioner to disapprove "rates applicable to group or individual contracts...." Finally, the 1988 45-day automatic approval provision, N.J.S.A. 17:48E-27.1, refers to the filing of a change in rates "for coverage under individual contracts which are not experience rated...."
It is from these verbiage alterations, that BCBS reads an abandonment by the Legislature of community rating for non-group contracts. This argumentive reed is slim indeed. The verbiage changes, as we read them, are merely attributable to the authorization of the 1988 action for experience rating for small groups. That is to say, prior to 1988, as we have noted, both non-group contracts (a phrase interchangeable and synonymous with individual contracts) and small group contracts were required to be community rated. Reference to community rating could therefore mean one, the other, or both. Thus the juxtaposition was community rating versus experience rating, not individual contracts versus group contracts, because some groups  small groups  were also required to be community rated. With the extension of experience rating to small groups, the juxtaposition of individual contracts and group contracts became completely comprehensive in terms of self-defining the rating methodology. That is, individual now means community-rated and vice versa, and group means experience-rated and vice versa. Consequently, rather than supporting a legislative abandonment of community rating for non-groups, these technical changes, in our view, can only support the conclusion that the Legislature permitted experience rating for all groups and required retention of a different rating method, namely community rating, for non-group contracts. Finally, we are aware that the Study Commission's Report, supra, assumes that the 1988 Act permitted demographic rating for non-group contracts. *452 The Report does not, however, indicate any statutory basis for such an assumption, and we perceive none.
In reviewing the Commissioner's order, we appreciate the deference owed to an agency's interpretation of a statute for whose implementation and administration it is responsible. See, e.g., Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984). Nevertheless, the appellate court is not bound thereby, particularly when it concludes that the interpretation is not supported by either the text, the legislative purpose or the public policy embodied by the statute and is in fact contrary thereto. Moreover, the presumption of validity to which an administrative rate-making decision is entitled is also overcome by an action contravening the enabling statute. See, generally, Steinmann v. State, Dept. of Treasury, 116 N.J. 564, 575-578, 562 A.2d 791 (1989), N.J. Cham. Commerce v. N.J. Elec. Law Enforce. Comm., 82 N.J. 57, 82-83, 411 A.2d 168 (1980). The Commissioner offered no analysis of the enabling legislation here that supports his conclusion respecting the propriety of demographic rating, and we are convinced that the Legislature has not authorized it.
In reaching our decision, we are mindful of the increasing and inordinate cost and complexity of the health care delivery system and the consequent burdens placed thereby on BCBS. We also recognize the elementary proposition that an insurer is better off when it collects premiums from non-claimants. Thus we appreciate that most commercial health insurers use demographic rating systems for non-group contracts so that those who are statistically most likely to generate claims, irrespective of their individual utilization likelihood, either pay higher premiums or are priced out of the market. At the same time, charging low premiums to statistically likely non-claimants attracts low-risk business, adding more premium dollars to funds that are less likely to have to be paid out for claims. BCBS bases its asserted need for demographic rating on the contention that it must be able to compete with the commercial *453 insurers in order not to lose the low-risk premium dollars with which to offset the high-risk claims. It does not, however, as candidly acknowledge that the demographic rating system will also reduce its high-risk claim exposure by making coverage less affordable for high-risk subscribers. That, of course, is the rub. BCBS is not a commercial carrier. It is a non-profit tax-exempt corporation invested with the public interest. What may be good business practice for commercial insurers is not necessarily an option compatible with its unique, statutorily-mandated public role and may in fact be an option antithetical to that role. We are satisfied that demographic rating for non-group contracts does indeed subvert BCBS's statutory purpose of providing affordable protection to a broad-based community. We are also satisfied that BCBS has not demonstrated that denial of that option presently threatens its financial viability. But even if it did, it was exclusively for the Legislature, whose creature BCBS is, to have decided if at all and if so, within what parameters and based on what demographic factors, demographic rating could be used.[6] It did not do so.
With respect to BCBS's claim of financial necessity both for the rate increase and the demographic basis thereof, the record lacks any substantial documentation to support the proposition that the anti-selection spiral and its attendant financial woes have already occurred. There is considerable speculation and uncertainty in the Commissioner's decision as to whether the BCBS loss of subscribers is due to lapsing by economically disadvantaged persons or to shopping around by low risk persons or, if due to both, in what proportion. Moreover, present existence of the spiral is contraindicated by the Tillinghast *454 Report, supra, fn. 3, which, while supporting BCBS's proposal for demographic rating, pointed out, however, that:
The Blue Cross is not the most competitive carrier for the average utilization or below average utilization group or individual. From various facts that we have reviewed such as the historical days per 1,000 members, age/sex distribution of direct pay and community group members and location of community group members, the Blue Cross has not been or is currently in an "assessment spiral". However, the conditions that currently exist make it vulnerable to such a problem. With the current Plan deficit and the need to increase premium rates to become self supporting and to rebuild the surplus from the negative amount to the statutory positive amount an across-the-board premium increase may drive away the better utilization risks which have other insurance alternatives.
Because of this potential problem we believe that actions other than premium rate increases should be implemented.
These other actions have been referred to in several sections and include better underwriting practices, more sophisticated premium structures, and plan design changes which will protect Blue Cross against anti-selection by new members. [Tillinghast, supra, at 25-26] [Emphasis added]
The record thus does not support the conclusion that there is an imminent crisis. It appears that BCBS, by reason of the relief it did receive from the Legislature in 1988, will be able to avert financial disaster until the Legislature has an opportunity to consider and act upon the Study Commission's report.
We also note with respect to the demographic scheme itself that beyond its constitutional vulnerability, there is no substantial support in the record for the classifications themselves or the actuarial basis on which they are premised. Moreover, the personnel of the Department of Insurance were sufficiently concerned about their actuarial inconsistency to cause the Commissioner to "collapse" the classes. See fn. 4, supra. A more prudent course for the Commissioner to have followed might have been to defer implementation of the demographic rating system until the Department's experts were satisfied that it was indeed fair and actuarially sound.
The Public Advocate concedes that BCBS is entitled to some rate relief. We cannot, however, affirm an overall rate increase whose distribution premise is invalid since it is the schedule of specific rates which is the ultimate subject of the *455 Commissioner's order. Recognizing, however, the need to stabilize and regularize BCBS's 1990 rates, we remand to the Commissioner for his expeditious review of and action on the November 14, 1989 rate-increase request, subject to the opportunity of both BCBS and the Public Advocate to make such additional presentations within such time as the Commissioner in his discretion allows. We also direct the Commissioner to enter appropriate interim orders in respect of the premium notices BCBS has already sent to assure that no non-group contract is permitted to lapse by reason of the subscriber's failure to pay a demographically-rated premium, to determine the manner in which premiums already paid under the order shall be disposed of by BCBS in the mutual interests of subscribers and the corporation, and to address such other matters as may require his immediate resolution.
The rate-increase order appealed from is reversed and the matter remanded to the Commissioner of Insurance for further proceedings consistent with this opinion.
NOTES
[1] N.J.S.A. 17:48E-2(a) provides for the establishment of a health service corporation by two methods, incorporation under the Act or by merger of a hospital service corporation and a medical service corporation.
[2] All parties stipulate and there appears no question that as a matter of common industry understanding, N.J.S.A. 17:48 and 48A mandated community ratings for small-group and non-group contracts despite the failure of the legislation to so state in direct, plain and expository language. Our review of these statutes persuades us that the legislative intention in this regard is expressed by the repeated juxtaposition of the phrases "experience rates" and "community rates" throughout the acts. See e.g., N.J.S.A. 17:48-6.9, 17:48-10, 17:48A-7.9. See also N.J.S.A. 17:48E-26(c).
[3] See Tillinghast, Report to Commissioner Kenneth D. Merin, Department of Insurance, State of New Jersey on Blue Cross & Blue Shield's Underwriting Premium Pricing Systems, June 1, 1988, annexed as Exhibit C to Blue Cross Blue Shield Study Commission, Phase II Final Report.
[4] Although the Commissioner approved the five-category rating scheme in concept, he also ordered BCBS to "compress" the rate differential among the categories having concluded that some categorical assignments were inaccurate as "inconsistent with the experience of the particular combination involved." Rather than rejecting the system, he permitted its implementation subject to "compression" and further subject to his order that BCBS "develop and submit within 180 days a classification plan which will accurately reflect the expected experience of all age/gender/territory classifications currently being used by BCBS NJ."
[5] The Commissioner's opinion does not make clear what the primary mission is if this is the ancillary one.
[6] For example, if the Legislature were to consider demographic rating in the future, it might opt to determine whether a gender factor should be permitted as a matter of constitutional proscription or public policy. It might also wish to consider the utility of a two-factor demographic system as well as whether a particular demographic system would have an unfair impact on racial or other minorities. See, generally, as to anti-discrimination requirements in rate practices, N.J.S.A. 17:29B-4(7)(c).